UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| VS. ) | DOCKET NO. 2:24-cr-00134 -LEW |
| ) | |
| ANTHONY LOBOR ) | |
| ) | |

## MOTION TO SUPPRESS AND MOTION FOR *FRANKS* HEARING

NOW COMES defendant Anthony Lobor, by and through undersigned counsel, and moves this Court to suppress all evidence obtained through execution of an overbroad and invalid warrant, and alternatively, for an evidentiary hearing pursuant to *Franks v. Delaware*, 438 U.S. 154 (1978).

## FACTS

### a. July 6, 2024, Incident at Crown Fried Chicken

At 1:50 am on July 6, 2024, Portland Police responded to a dispatch report of a black man in a gray sweatshirt "with a black pistol on him" at Crown Fried Chicken on Forest Avenue in Portland. Def. Exh. 1, Ofc. Cannell Body Cam at 01:52:50, 1:53:00. When officers arrived, they were advised that the individual had left. *Id*. at 01:53:35. According to witness reports, the individual had argued with another patron, and during the argument displayed a gun in the waistband of his pants. *E.g. id*. at 01:54:14 ("a little altercation, a guy with a gun and just some yelling."); *id*. at 01:57:10 (reporting the man had "kinda flashed" the gun because the man thought that another patron was staring and that in response the patron had "hopped up."). According to the other patron involved in the argument, the man had threatened to shoot him and others. *Id*. at 01:57:51. The altercation ended when two individuals with the man pulled him out of the restaurant. *Id*. at 01:57:50. Shortly thereafter, a gunshot was heard. Def. Exh. 2, Det. Googins

1

Incident Report (excerpt) at 1. In a search of the parking lot outside the restaurant, officers recovered a single shell casing. *Id*. Next to the shell case was an indent in the pavement. *Id*.

Officers obtained surveillance video from inside the restaurant at the time of the incident. *See* Def. Exh. 3, Det. Goodman Supp. Incident Report at 1. From the video, officers captured a still photograph of the man they believed flashed the firearm and circulated the photograph to the Portland Police Department. *See id*. After seeing the photograph, Detective Lieutenant Nicholas Goodman believed he recognized the individual depicted to be Anthony Lobor. *Id*. According to Lt. Goodman's report he came to know Anthony and his family as an agent working on the investigation and trial of Abdirahman Huessin Haji Hassan, who was convicted in 2015 of murdering Anthony's older brother Richard. *Id.*

Shortly thereafter, Detective Jessica Googins and Detective Aaron Curlee were assigned to the investigation. *See* Def. Exh. 2 at 2. Following Lt. Goodman's suspected identification, Det. Googins assembled a photograph identification array. *Id*. at 2-3. Three witnesses[1] identified Anthony as the individual involved in the incident at Crown Fried Chicken. Based on the positive identifications, on July 6, 2024, Det. Googins sought an arrest warrant for Anthony. *Id*.

### b. Surveillance of 42 Kellogg Street.

On July 6, 2024, Det. Curlee separately sought and obtained a warrant for a cell phone number law enforcement records indicated was associated with Anthony. Def. Exh. 4, Det. Curlee Report at 1. Included in the request was voicemail, text, and multimedia information from the previous 30 days, and prospective location data for Anthony's cell phone. Def. Exh. 5, T-Mobile Warrant at 2. According to Det. Curlee's report, following the grant of the warrant, T-Mobile started providing him with location pings in ten-minute intervals. Def. Exh. 4 at 1. From July 6,

---

[1] The witnesses included the individual involved in the argument with the man with the firearm, and the witnesses two friends.

2024, at approximately 10:17 pm to July 8, 2024, at approximately 1:57 pm, the location pings provided a result of "absent subscriber." *Id*.

While Det. Curlee continued to monitor the cell phone ping data, at 1:27 pm on July 8, 2024, Portland Police set up a hidden camera to surveil the front door and adjacent area outside of 42 Kellogg Street – an address where they believed Anthony resided. Def. Exh. 6, Ofc. Calloway Supp. Incident Report at 1. At 1:40 pm the camera showed four males exiting the apartment. Def. Exh. 6, at 1. At 1:51 pm the camera showed another individual exit the apartment carrying a white plastic bag and at 2:16 pm, walk north and out of the camera's view. *Id*. at 1-2. At 3:16 pm the camera showed the individual returning to the area and then leave again. *Id*. at 2. At 4:19 pm, the camera showed the individual again returning to the outside of 42 Kellogg Street with a white plastic bag. *Id*. at 2-3. The camera showed the individual walk to the garbage cans in front of the residence with the white bag, step out of view momentarily, and then step back into view without the plastic bag. *Id*.

Shortly thereafter, officers dispatched to 42 Kellogg Street, including plain clothes officers, made the decision to approach the individual who they believed to be Anthony. Def Exh. 3 at 1-2. Upon observing the officers approaching him, Anthony took off running. *Id*. After a brief foot chase, Anthony was arrested. *Id*. At the time of his arrest, officers recovered a cell phone, a sum of cash, and empty "nip" sized alcohol bottles. *Id*. at 2, Def. Exh. 7 Ofc. Beals Incident Report at 1.

**c. Arrest and Interview at the Portland Police Department**.

Following his arrest, Anthony was transported to the Portland Police Department. At 05:26 pm, Det. Googins and Det. Matthew Rider attempted to interview Anthony. Def Exh 8, Det. Googins Supp Report at 3. Det. Googins asked Anthony if he wanted to talk about the incident

that occurred at the Crown Fried Chicken. *Id*. Anthony responded that he had nothing to say. *Id*. Det. Googins advised Anthony that they were getting a warrant and that he would be staying at the police station until the warrant was signed. *Id*. at 4. Anthony inquired as to what they were getting a warrant for and in response to learning that it was for 42 Kellogg Street, stated that there was no weapon in the residence. *Id*. He asked Det. Googins "if there is a weapon that you're looking for and if you find it before then you don't need a search warrant for anything? " *Id*. Det. Rider responded that the search warrant would look for other items such as receipts for weapons and ammunition. *Id*. Anthony replied: "What if I had it on me and it fell and then you found it?" In response to Det. Googins asking if he wanted to tell them where the gun was, Anthony responded, "most likely, yeah." Anthony subsequently stated, "right outside in front of the, um can I talk to a lawyer actually before?" *Id*.

In response to this statement, Det. Googins told Anthony that it would take time to get him a lawyer and likely would not occur until after he went before the court. *Id*. However, according to her report, Det. Googins subsequently spoke with Detective Daniel Townsend about Anthony's request for a lawyer. *Id*. Det. Townsend was familiar with a defense attorney that had previously worked with the Lobor family and attempted to contact that individual. *Id*. At the same time, Det. Townsend alerted law enforcement still at 42 Kellogg Street as to Anthony's statements with respect to the location of the gun. *See* Def. Exh. 9, Det. Townsend Report at 2*;* Def Exh. 10, Sgt. Rand Body Cam at 17:55. In response, Portland Police deployed a K9 and called for an individual with a metal detector to search the area between 42 Kellogg Street and Anthony's arrest. *See* Def. Exh. 10 at 17:49-18:08.

While the initial attorney that Det. Townsend attempted to contact was not available, he was able to find another attorney who was willing to speak with Anthony by phone. Def. Exh. 9

4

at 2-3. Anthony spoke with the attorney and then advised Det. Townsend that he was going to invoke his right to remain silent. *Id*. at 3.

### d. Search Warrant and Search of 42 Kellogg Street.

As detailed above, Anthony was arrested and by 5:26 pm, he was in custody at the Portland Police Department and being interviewed by Det. Googins and Det. Rider. Def. Exh. 8 at 3. Shortly thereafter, Anthony had made statements about the location of the gun, and in response to those statements, by 5:56 pm, Portland Police deployed a K9 unit to search the area. *Id*.; Def. Exh. 10 at 17:56.

While Anthony was in custody, Det. Curlee drafted a request for a search warrant and affidavit. *See* Def. Exh. 11 Search Warrant Request and Affidavit at 6 (noting Anthony was arrested). In his request, Det. Curlee wrote that based on his education, training, and experience, and the facts set forth in his affidavit, he had probable cause to believe that Anthony "was identified as the suspect who committed the offense of Criminal Threatening with a Dangerous Weapon and Threatening Display or Carrying a Concealed Weapon on July 6, 2024," and that the firearm that was used in the commission of the offenses could be located inside 42 Kellogg Street along with evidence of instrumentalities of the above two enumerated crimes. *Id*. at 7. He requested authority to search 42 Kellogg Street, any outbuildings, and vehicles located near the residence or otherwise associated with Anthony, and to search within those areas for and seize the following items:

1. A buccal swab from Anthony for the purpose of comparing his DNA to potential DNA evidence found on a firearm shell casing recovered at the scene;

2. any persons located within the structure;

3. portable electronic devices capable of communication through cellular and/or Wi-Fi connections attributable to Anthony;

4. firearms, components of firearms, ammunition, and components thereof;

5

5. firearm accessories, to include but not limited to, magazines, boxes, scopes, sights, holsters, and/or cleaning equipment;

6. documentation related to firearm possession, to include but not limited to, receipts of purchase or sale of firearms, application for pistol or other permits or pistol permit identification cards.

7. any and all firearm parts and accessories to include but not limited to, safe utilized to store firearms, holsters, boxing/packaging materials, and other ammunition loading devices utilized to hold ammunition and storage boxes that can contain ammunition;

8. any and all ammunition including ammunition storage boxes and pouches;

9. documentary or other items of personal property that tend to identify the persons in residence, occupancy, control or ownership of the respective locations to be searched, including but not limited to mortgage statements and rental agreements, photographs, canceled mail, personal telephone books, identification documents, and keys;

10. books, records, receipts, notes, and ledgers relating to the purchase of financial instruments and or the transfer of funds;

11. clothing associated with the incident on July 6, 2024;

12. samples/swab of any and all suspected biological materials, including: suspected blood; firearm(s); firearm(s) accessories including but not limited to, cartridges(s), ammunition, magazines(s), storages(s);

13. hairs, fibers, including any and all other trace evidence that could later be forensically examined for a potential DNA profile;

14. Any clothing that contains suspected blood, hair, fibers, including any and all other trace evidence that could later be forensically examined for a potential DNA profile;

15. proof of occupancy or ownership of residence, and/or evidence demonstrating possession, dominion, custody, and/or control of, and/or presence at, the premise to be searched or any portion thereof including, but not limited to: documents such as titles, deeds, leases, bills, books, receipts, blank checks containing names and/or addresses, canceled checks, addressed bail, photographs, videotapes, prescription bottles, personalized property;

16. scheduled drugs, namely Cocaine, Fentanyl Compound, and/or Methamphetamine, among other illicit drugs;

17. drug paraphernalia;

18. Sums of money obtained from the sale of scheduled drugs or possessed or intended for the purchase/exchange of scheduled drugs.

*Id*. at 1-3.

In support of his requested warrant, Det. Curlee submitted a 24-paragraph affidavit. *Id*. at 4-7. In his Affidavit, Det. Curlee detailed the incident that occurred at Crown Fried Chicken on July 6, 2024; the identification of the surveillance photograph by Lt. Goodman; the subsequent identification of Anthony by three witnesses; that he had sought and obtained a warrant for Anthony's cell phone records including prospective location information; at 2:04 pm cell phone location information showed Anthony in the area of 42 Kellogg Street; law enforcement records indicated Anthony had provided 42 Kellogg Street as his address; officers conducting surveillance in the area witnessed a male that "appeared to be Anthony" outside the residence, as well as "going in and out of the residence"; that an arrest warrant had been issued for Anthony; that Anthony had previously been arrested for unlawful possession of scheduled drugs; and that Anthony was apprehended after attempting to flee from police. *Id*.

At 06:53 pm the warrant was signed by a Maine District Court Judge. Def. Exh. 12, Search Warrant at 4. After the warrant was signed, Det. Curlee notified Det. Googins back at Portland Police station and drove to 42 Kellogg Street with three copies. Def. Exh. 4 at 4. Upon his arrival Det. Curlee noted there was a typographical error in the registration for one of the vehicles that officers sought to search. *Id*. He contacted Det. Googins and requested she author an Addendum to the warrant with the correct registration number. *Id*.

Officers, meanwhile, commenced a search of the residence. *Id*. In a bedroom on the second floor of the residence, officers located several small plastic baggies containing suspected narcotics, three firearms, and two flip phones. *Id*. at 6-9. In another room on the second floor of the residence, officers located additional currency and four additional firearms. *Id*. at 5. After completion of the search of the residence, Officers searched the trashcans outside the residence.

7

*Id*. at 8-9. There they observed a white shopping bag. *Id*. In the shopping bag they recovered a handgun matching the description of the handgun described at Crown Fried Chicken. *Id*.

Back at the Portland Police station, Det. Googins obtained a DNA sample from Anthony. Def. Exh. 8 at 5. According to her report, after obtaining the swab, Det. Googins invoked the "public safety exception to the *Miranda* warning" and again attempted to question Anthony about the location of the firearm. *Id*. In response, Anthony advised his lawyer told him not to say anything and again invoked his right to remain silent. *Id*. Anthony was transported to the Cumberland County Jail. *Id*.

## ARGUMENT

The Fourth Amendment protects the rights of all individuals "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend IV. "At the very core of the Fourth Amendment stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion." *Kyllo v. United States*, 533 U.S. 27, 31 (2001) (internal citations omitted); *see also Georgia v. Randolph*, 547 U.S. 103 (2006) ("We have, after all, lived our whole national history with an understanding of the ancient adage that a man's house is his castle to the point that the poorest man may in his cottage bid defiance to all the forces of the Crown") (internal citations omitted).

With limited exceptions, the Fourth Amendment mandates that law enforcement secure a search warrant supported by probable cause prior to effecting a search or seizure. *United States v. Paneto*, 661 F.3d 709, 713 (1st Cir. 2011). "It is established law, that a warrant affidavit must set forth particular facts and circumstances underlying the existence of probable cause, so as to allow the magistrate to make an independent evaluation of the matter." *Franks v. Delaware*, 438 U.S. 154, 165 (1978) (internal citations omitted). With respect to the place to be searched and the

enumerated evidence to be seized, the Fourth Amendment requires that it be described with particularity. *See Stanford v. Texas*, 379 U.S. 476, 481-85 (1965) ("The Fourth Amendment provides that no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and *particularly describing* the place to be searched, and the persons *or things to be seized*.") (emphasis in original) (internal citations omitted). "[A] warrant that fails to conform to the particularity requirement of the Fourth Amendment is unconstitutional." *Massachusetts v. Sheppard*, 468 U.S. 981, 988 n.5 (1984).

Where a warrant issues on less than probable cause, and where the error is of law enforcement's own making, the "good faith" exception is inapplicable. *United States v. Cordero-Rosario*, 786 F.3d 64, 72-73 (1st Cir. 2015) (finding no "good faith" exception where error was due to law enforcement officer's failure to provide the acts in the affidavits that could have supported the warrants' issuance). Thus, the exclusionary rule bars admission into evidence any fruits obtained during the illegal search. *See Id*.

In this case, the warrant sought by Det. Curlee was substantially overbroad granting authority to law enforcement to, in effect, conduct a generalized search of 42 Kellogg Street, in violation of Anthony's Fourth Amendment Rights. Furthermore, Det. Curlee's affidavit contained a material omission made with reckless disregard for the truth, thus providing an alternative basis for suppression.

      **a. The Warrant Was Impermissibly Overbroad in Violation of Anthony's Fourth Amendment Rights.**

To obtain a warrant, an officer's affidavit must demonstrate both probable cause to believe a crime has been committed (the commission element) and probable cause to believe that the enumerated evidence of the offense will be found at the place the officer seeks to search (the nexus element). *Cordero-Rosario*, 786 F.3d at 69. With respect to the "place to be searched, and the

9

persons or things to be seized," the Fourth Amendment unambiguously requires they be "particularly describe[d]" in the warrant. *United States v. Moss*, 936 F.3d 52, 58 (1st Cir. 2019). "The particularity requirement demands that a valid warrant: (1) must supply enough information to guide and control the executing agent's judgment in selecting where to search and what to seize, and (2) cannot be too broad in the sense that it includes items that should not be seized." *United States v. Kuc*, 737 F.3d 129, 133 (1st Cir. 2013). Thus, the scope of the warrant should not be "broader than can be justified by the probable cause upon which the warrant is based." *United States v. Galpin,* 720 F.3d 436, 445 (2d Cir. 2013); *United States v. Hurwitz*, 459 F.3d 463, 473 (4th Cir. 2006) (The Fourth Amendment requires that a warrant be "no broader than the probable cause on which it is based.") (quoting *United States v. Zimmerman*, 277 F.3d 426, 432 (3d Cir. 2002).

In examining the sufficiency of a warrant, a reviewing court is limited to the facts and opinions contained within the warrant and supporting affidavit's four corners. *United States v. Austin*, 991 F.3d 51, 55 (1st Cir. 2021). While significant deference is afforded to the magistrate judge's initial evaluation of the application, the warrant must be invalidated where the reviewing court finds "no substantial basis to conclude that probable cause existed." *Cordero-Rosario*, 786 F.3d at 69.

    i.    *Det. Curlee's affidavit provided no basis to support a search for drugs, financial information, personal items or other identifying documents, electronics associated with Anthony, "any persons," any and all firearms and any associated items.*

In his request for a warrant and affidavit, Det. Curlee clearly specified that the crimes he was investigating was Criminal Threatening with a Dangerous Weapon in violation of 17-A M.R.S. § 209 and Threatening Display and Carrying of a Concealed Weapon in violation of 25 M.R.S. § 2000-(A)(1)(A). The only incident detailed in the affidavit was the incident at Crown

10

Fried Chicken that occurred on July 6, 2024. Yet, in his request for a warrant, Det. Curlee included, among other items, (1) any illegal drugs, drug paraphernalia, or money believed to be associated with drug trafficking or intended for the purchase of drugs; (2) financial records; (3) records or other personal items that would "tend to identify" the authorized occupants of the residence; (4) any electronic devices capable of communication associated with Anthony; (5) "any persons;" and (6) any firearms, and anything related to those firearms (ammunition, firearm accessories, documentation of purchase or ownership records of any firearms).

There was no information in Det. Curlee's affidavit to support a finding of probable cause that drugs were involved in the offense or that Anthony was engaged in drug trafficking or using drugs at that time, or that drugs or evidence of drug sales would be found at the residence. *Illinois v. Gates*, 462 U.S. 213, 239 (1983) (A simple assertion of police suspicion, without more, is insufficient to support a finding of probable cause); *United States v. Irving*, 347 F. Supp. 3d 615, 623 (D. Kan. Sep. 28, 2018) ("it is not enough that the warrant makes reference to a particular offense; the warrant must ensure that the search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."). With respect to the residence, other than the fact that law enforcement believed Anthony to live there, there was no indication that the residence or Anthony's or any other occupant's tie to the property was in any way connected to, or an instrumentality of the crimes of Criminal Threatening or Threatening Display of a Weapon. Nonetheless the warrant granted law enforcement permission to search for and seize all "documents such as titles, deeds, leases, bills, books, receipts, blank checks containing names and/or addresses, canceled checks, addressed bail, photographs, videotapes, prescription bottles, and personalized property" that would "tend" to identify who lived there. The warrant further granted officers the authority to search and seize any financial

11

records without any limitation. Neither the warrant request nor affidavit provided any information as to the potential relevant evidence that officers sought to obtain from these records or other occupants. Finally, the warrant authorized officers to search the home for "any persons" without any information as to whom they were seeking, or why there was probable cause to believe those individuals were connected to the offense.

While the affidavit did likely provide sufficient information to support a probable cause determination that a handgun was involved in the alleged offense, there was no evidence – either contained in Det. Curlee's affidavit or otherwise – to support a finding a probable cause that there was more than one firearm involved in the offense. *See United States v. Gardner*, 537 F.2d 861 (6th Cir. 1976) (holding warrant authorizing search of "all firearms and ammunition" overbroad). Despite this, the warrant nonetheless granted law enforcement the authority to rummage throughout the residence for evidence of more than one firearm, all ammunition, and related accessories and to seize those items even where it was clear they had no connection to the alleged offense.

> ii. *In addition to authorizing officers to search for evidence that lacked connection to the enumerated offenses, there was insufficient information in the affidavit to support a finding that the items sought would be found at the residence.*

In addition to granting officers authority to search for items that were wholly unconnected to the alleged offense, the warrant also granted officers authority to search for evidence for which there was no probable cause to believe had a nexus with the property.

Most obviously among these was Anthony's DNA – either obtained through a buccal swab or through other hair, fibers, blood or other materials that could be examined for a potential DNA profile. As noted in the warrant request and affidavit, at the time Det. Curlee sought the warrant,

Anthony was already in custody. Thus, a search of the residence was not required to recover this evidence. Officers could – and did – obtain DNA from Anthony at the police station.

Similarly, with respect to Anthony's cell phone, officers had already obtained a warrant for Anthony's cell phone records including all voicemail, text, or multimedia messages from June 6, 2024, through July 6, 2024. Further, as noted above, officers had also recovered a cell phone at the time of Anthony's arrest. Moreover, they had the cell phone in their possession. There was no basis to believe that Anthony was in possession of another electronic device that contained evidence of or communication about the incident that had occurred at the Crown Fried Chicken.

"It is familiar history that indiscriminate searches and seizures conducted under the authority of 'general warrants' were the immediate evils that motivated the framing and adoption of the Fourth Amendment." *Payton v. New York,* 445 U.S. 573, 583 (1980). Moreover, the Fourth Amendment "protect[s] citizens against general, exploratory rummaging in a person's belongings." *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971). In this case, the warrant granted law enforcement authority to conduct a virtually unlimited search of 42 Kellogg Street and seize items wholly unconnected to the offense being investigated and for which there was no probable cause. And this is precisely what law enforcement did: from going through every room of the house, to searching in the seams of clothing, and rifling through personal items.

As the warrant was unconstitutionally overbroad in violation of Anthony's Fourth Amendment rights, on this basis alone the evidence should be suppressed.

### b. Det. Curlee's Affidavit Contained Material Omissions Made with Reckless Disregard for the Truth.

A law enforcement officer's affidavit generally enjoys a presumption of validity. *Franks*, 438 U.S. at 171. However, where a defendant makes a substantial preliminary showing that the officer's affidavit contained knowingly false statements or statements made with reckless

13

disregard for the truth, and where that statement was material to establish probable cause, the Fourth Amendment entitles the defendant to a hearing to further test the affidavit's veracity. *Franks*, 438 U.S. at 155. In addition to false statements, material omissions may also form the basis for a *Franks* Hearing. *United States v. Gifford*, 727 F.3d 92, 99-100 (1st Cir. 2013) (affirming district court finding of reckless material omissions where probable cause was based in part on disparities in electrical usage between defendant's houses and neighbors' houses, where the officer omitted from his affidavit that one of the houses was substantially smaller and defendant operated a horse boarding business).

To demonstrate a reckless disregard for the truth, a defendant must show the affiant "in fact entertained serious doubts as to the truth" *United States v. Ranney*, 298 F.3d 74, 78 (1st Cir. 2002) (internal citations omitted). This may be inferred "from circumstances evincing obvious reasons to doubt the veracity of the allegations." *Id*. With respect to material omissions, "recklessness may be inferred where the information was critical to the probable cause determination." *Burke v. Town of Walpole*, 405 F.3d 66, 82 (1st Cir. 2005) (internal citations omitted) *see also United States v. Stewart*, 337 F.3d 103, 107 (1st Cir. 2003) (meticulous compliance with the Fourth Amendment requires agent ask 'Is this information so trivial, remote or irrelevant that no reasonable official could assign it weight in coming to a decision to issue the warrant?" Unless an affirmative answer can be given, the information should be included'"); *Wilson v. Russo*, 212 F.3d 781 (3d Cir. 2000) ("omissions are made with reckless disregard for the truth when an officer recklessly omits facts that any reasonable person would know that a judge would want to know").

Under *Franks*, a court's inquiry examines whether the investigation was, as a whole, reckless. *United States v. Roman*, 311 F. Supp. 3d 427, 435 (D. Mass 2018). Thus, a deliberate or

reckless material misrepresentation or omission by a law enforcement official other than the affiant also may provide basis for a hearing. *Id*. ("The vast majority of courts recognize the *Franks* inquiry should not focus solely on the affiant, because a different rule would permit government officials deliberately to keep from affiants or the court information material to the determination of probable cause and by such conduct avoid the necessity of a Franks hearing") (collecting cases).

At the time Det. Curlee submitted the request for a warrant and accompanying affidavit, Anthony had been independently identified by three witnesses. Law enforcement was in possession of surveillance video from the night of the incident. Anthony was in police custody along with his cell phone.

As discussed above, while being interviewed by detectives in police custody, Anthony made affirmative statements indicating the firearm was not in the residence. At the time he made those statements, detectives found them sufficiently credible to immediately divert officer time and resources to searching for the firearm – including calling a K9 unit and an officer with a metal detector to the area. When Anthony invoked his right to remain silent and requested an attorney, officers scrambled to find him an attorney as quickly as possible in the hopes that he would then tell them the location of the firearm. When, after consulting with an attorney, Anthony again stated he wished to remain silent, detectives went so far as to cite to a "public safety exception" as a basis to reinitiate their interrogation of Anthony despite his invocation of his Fifth and Sixth Amendment rights. Moreover, as is clear from their actions, law enforcement believed Anthony's statement that the firearm was outside of the residence. Furthermore, in addition to these statements, law enforcement had recorded video footage showing Anthony in possession of a bag that was let outside the residence.

Moreover, while law enforcement had information indicating Anthony resided at 42 Kellogg Street, until his in-custody statement to Det. Googins, they had no specific information related to the location of the handgun. His A statements however, changed that. Despite this – and the importance ascribed to Anthony's statements by his colleagues - Det. Curlee nonetheless entirely omitted them a from his Affidavit. Det. Curlee also entirely omitted from his affidavit that law enforcement had recorded video footage depicting Anthony with a bag that was left outside the home – providing further corroborating evidence that the gun they were looking for was not in the location they were seeking to search.

## CONCLUSION

The warrant in this case was so overbroad as to grant law enforcement authority to conduct a generalized search of Anthony's home. As such, it violated the Fourth Amendment's particularity requirement. Further, as Det. Curlee's affidavit contained material omissions, Anthony has made the substantial preliminary showing to warrant a granting of his request for a *Franks* Hearing.

WHEREFORE, Defendant Anthony Lobor respectfully moves this Court to suppress all evidence obtained because of the unlawful search pursuant to an invalid warrant and/or grant of his request for an evidentiary hearing pursuant to *Franks v. Delaware*.

Dated this 20th day of December 2024, at Portland, Maine

    Respectfully submitted,

        */s/ Grainne Dunne*
        _____
        Grainne Dunne
        *Attorney for Defendant*
        HALLETT WHIPPLE WEYRENS
        6 City Center, Suite 208
        P.O. Box 7508
        Portland, Maine 04112-7508
        PH: 207-775-4255
        gdunne@hww.law

# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

## CERTIFICATE OF SERVICE

I, **Grainne Dunne**, attorney for **Anthony Lobor** hereby certify that I have served electronically, a copy of this motion upon **Assistant United States Attorney Shira Furman, Esq.**, via the ECF system.

Dated: December 20, 2024                                    /s/ *Grainne Dunne*
                                                                                  Counsel for the Defendant