## UNITED STATES DISTRICT COURT
## DISTRICT OF MAINE

UNITED STATES OF AMERICA

v.                                                    No. 2:24-cr-00134-LEW

ANTHONY LOBOR

### GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS AND MOTION FOR *FRANKS* HEARING

The United States of America (the "Government") hereby responds in opposition to Defendant Anthony Lobor's ("Defendant") Motion to Suppress and Motion for a *Franks* Hearing ("Motion"). *See* Dkt. 41. For all of the reasons set forth below, Defendant's Motion should be denied.

### I.      Factual Background

On October 7, 2024, Defendant was charged by complaint with possession with intent to distribute controlled substances. Dkt. 3. The Government filed a motion for detention, and Defendant ultimately waived his right to a hearing and was ordered detained pending trial. Dkts. 11, 27, 28. On November 20, 2024, the grand jury returned a two-count indictment, charging Defendant with possession with intent to distribute controlled substances and possession of firearms in furtherance of drug trafficking. Dkt. 29. The charges stem from evidence seized during the execution of a state search warrant at Defendant's residence. Def. Ex. 11 (Search Warrant Affidavit); Def. Ex. 12 (Search Warrant).

On July 6, 2024, at approximately 1:50 a.m., the Portland Police Department ("PPD") responded to Crown Fried Chicken, a restaurant located at 408 Forest Avenue, Portland, Maine, after a 911 caller reported a disturbance. Def. Ex. 1 (Off. Cannell Body Cam); Def. Ex. 2 at 1 (Det. Googins Report). The caller stated that a black male wearing a grey sweatshirt was trying to fight people and that he had a black pistol. *Id.* Bystanders told

1

PPD that the individual threatened people with a gun, and that they heard a gunshot shortly after he left the restaurant. Def. Ex. 2 at 1-2. In the parking lot outside the restaurant, officers located a bullet, a divot in the pavement from where the bullet impacted the ground, and a FN 5.7 x 28mm shell casing. *Id.*

Officers spoke with Witness 1, who was in the restaurant with two friends when he encountered a tall black male. Witness 1 reported that the individual started to argue with him because he thought Witness 1 was staring. *Id.* at 1; Gov. Ex. 1 at 1-2 (Off. Cannell Report). The individual said he had a gun and lifted his shirt to expose a gun, which Witness 1 believed was a P365 Sig Sauer. Def. Ex. 2 at 1; Gov. Ex. 1 at 2. The individual also stated that there was going to be "a mass shooting" in the restaurant and that he had "a bullet for every one of [them]." Def. Ex. 2 at 1. Law enforcement obtained security footage of the incident, which was consistent with Witness 1's account. *Id* at 2. PPD took a screenshot of the individual described by Witness 1 from the video footage and distributed it internally; Detective Goodman recognized the tall black male as Anthony Lobor. *Id.*; Def. Ex. 3 at 1 (Det. Goodman Report).

Witness 1, along with the two friends who were with him during the incident (Witnesses 2 and 3), agreed to go to PPD to provide a statement and view a photo array. Def. Ex. 2 at 2-3; Gov. Ex. 2 at 1 (Det. Curlee Report). Detective Googins compiled a photo array, and Detective Curlee met separately with each of the witnesses. Def. Ex. 2 at 2-3; Gov. Ex. 2. Each of the witnesses identified Anthony Lobor as the individual that threatened them with a gun. Def. Ex. 2 at 3; Gov. Ex. 2 at 3-4, 7. Witnesses 2 and 3 both described the firearm as a black semiautomatic handgun; however, one said it could have been a Glock

pistol, while the other said it might have been a Ruger or FN handgun. Gov. Ex. 2 at 5-6. Shortly thereafter, Detective Googins obtained an arrest warrant for Lobor.[1] Gov. Ex. 2 at 7.

PPD also determined that Lobor was associated with cell phone number 207-408-8082, which was registered to T-Mobile. *Id.* Detective Curlee applied for and obtained a search warrant for information associated with this cell phone number, which included historical and prospective location records. *Id.*; Def. Ex. 5 (T-Mobile Search Warrant). T-Mobile's response indicated that the device associated with the phone number was in the area of Crown Fried Chicken around the time of the incident. Def. Ex. 4 at 1 (Det. Curlee Supp. Report). Shortly after receiving the search warrant, T-Mobile also began providing location pings for the phone number at approximately 10-minute intervals. *Id.* at 1. A location ping on July 8, 2024, at approximately 2:08 p.m., showed the device in the area of 42 Kellogg Street, which was the address on Lobor's Maine driver's license and listed on his bail conditions. *Id.* at 2-3; Def. Ex. 8 at 2. Officers also saw Lobor in the area around that time. Def. Ex. 4 at 2. A subsequent location ping at 4:08 p.m. also showed the device near 42 Kellogg Street. *Id.* at 3-4.

Detective Curlee returned to PPD shortly after 4:08 p.m. and began drafting a search warrant for the 42 Kellogg Street residence, while other officers established surveillance in the area. *Id.* at 3; Def. Ex. 8 at 3. While Detective Curlee was drafting the warrant, other officers approached Lobor; he attempted to run but was arrested at approximately 4:56 p.m. after a brief foot pursuit. Def. Ex. 4 at 3-4; Def. Ex. 9 at 1 (Det. Townsend Report). At

---

[1]     The arrest warrant was for Criminal Threatening with a Dangerous Weapon, Threatening Display of or Carrying a Concealed Weapon, and Violation of Conditions of Release. Def. Ex. 11 ¶ 22. Lobor was on several sets of bail conditions at the time, including for possession of a scheduled drug. Def. Ex. 8 at 2 (Det. Googins Supp. Report). One set of bail conditions authorized searches of his person, vehicle, and residence upon articulable suspicion. *Id.*

the time of his arrest, Lobor had $1,249 in cash and a grey iPhone on his person. Def. Ex. 7 at 1 (Off. Beals Report).

Lobor was transported to PPD, and at approximately 5:26 p.m., Detectives Googins and Rider attempted to interview him. Def. Ex. 8 at 3. Lobor generally refused to answer questions or provide information about the location of the firearm used at Crown Fried Chicken. However, upon hearing that officers were in the process of applying for a search warrant for his residence, Lobor denied that there was a weapon in the residence and asked: (1) whether they would still need the search warrant if they found the gun, and (2) what would happen if the gun had fallen when he was running and they found it. Gov. Ex. 3 at 17:30-17:31 (Video of Interview). Lobor then began to tell the detectives where the firearm was located, but stopped and asked for a lawyer.[2] *Id*. A K-9 unit began searching the area around 42 Kellogg Street at approximately 5:55 p.m., and metal detectors were en route at approximately 6:40 p.m. Def. Ex. 10 at 17:55-17:46 (Sgt. Rand Body Cam); Def. Ex. 10A at 17:59, 18:24-18:25, 18:40 (Continued Sgt. Rand Body Cam). These efforts did not result in the recovery of the firearm.[3]

While all of this was occurring, Detective Curlee was finalizing the warrant and obtaining the signature of a judge; the warrant ultimately issued at 6:53 p.m.[4] Def. Ex. 12 at 4; *see also* Def. Ex. 10A at 18:24-18:25. Among other things, the warrant authorized PPD to search for and seize all firearms, firearm parts, ammunition, scheduled drugs, drug paraphernalia, money associated with drug trafficking, electronic devices capable of

---

[2]    Lobor stated that the firearm was "right outside in front of the…" before he stopped and asked for a lawyer. *Id*.
[3]    The K-9 search did, however, locate a Samsung cell phone that Lobor threw during the foot pursuit just before his arrest. Def. Ex. 7 at 1; Def. Ex. 10A at 18:13; Gov. Ex. 4 (Sgt. Rand Report).
[4]    Given that it was after normal business hours, Detective Curlee likely had to travel to the judge's home in order to swear out the warrant.

communication, and documents showing ownership or control of the residence. Def. Ex. 12 at 2-3.

Once Detective Curlee arrived at 42 Kellogg Street with the warrant, PPD began searching the residence. In a second-floor bedroom on the southwest side of the property, officers located several firearms, firearm parts, and ammunition, including: (1) a rifle and several magazines in a firearms case on the floor of the closet; (2) a multi-caliber rifle wrapped in nylon fabric under the bed; (3) a small caliber pistol in a bag on the floor of the closet; (4) two magazines containing rifle rounds in a bag on the floor of the closet; (5) a buffer tube spring consistent with an AR15 in a basket under the bedside table; (6) a 5.7 x 28mm cartridge on the bottom shelf of the closet; and (7) three empty firearms cases and multiple cartridges in a bag under the bed. Def. Ex. 4 at 7; Def. Ex. 7 at 2; Def. Ex. 9 at 4-8. In this bedroom PPD also located: (1) two plastic baggies containing cocaine in the pocket of a grey zip-up sweatshirt hanging in the closet; (2) two plastic baggies containing cocaine base and cocaine, respectively, sewn into the inner seam of the same grey sweatshirt; (3) one plastic baggy containing cocaine in a lockbox in the closet; (4) a vacuum sealer and vacuum seal bags underneath the bedside table; and (5) a high capacity kitchen scale on a moving box in the closet. Def. Ex. 4 at 6-8; Def. Ex. 7 at 2; Def. Ex. 9 at 4-8. PPD also located $476 in cash in a pocket of the grey sweatshirt, $1,039 in cash in the pocket of a green sweatshirt hanging in the closet, two flip phones between the mattress and the box spring,[5] and numerous documents in Lobor's name.[6] Def. Ex. 4 at 6-8; Def. Ex. 7 at 2; Def. Ex. 9 at 4-8. In a bedroom across the hall, PPD located additional firearms, ammunition, and cash, including: (1) a pistol and magazine in the pocket of a coat hanging in the closet;

---

[5]    PPD subsequently obtained a search warrant authorizing the review of these two phones and other phones seized on July 8, 2024, which Defendant does not address.
[6]    Most of the documents in Lobor's name were found in the closet shelving, in a drawer of the bedside table, and in bags on the closet floor and under the bed. Def. Ex. 4 at 8; Def. Ex. 9 at 4-8.

(2) another pistol in the closet; (3) a multi-caliber rifle and a multi-caliber pistol under the bed; (4) a handgun magazine with ammunition in the closet shelving; (5) a 9mm bullet in the closet shelving; and (6) $7,786 in cash in the closet shelving. Def. Ex. 4 at 5; Def. Ex. 7 at 2; Gov. Ex. 4 at 4-5.

At approximately 11:00 p.m., officers searched behind the trash cans outside the residence and found a plastic shopping bag. Gov. Ex. 6 at 1 (Off. Knight Report); Gov. Ex. 4 at 4. In plain view inside the bag was a pistol and a blue iPhone. Gov. Ex. 4 at 4; Def. Ex. 7 at 2.

## II.    Summary of the Argument

This Court should deny the Motion to Suppress because the affidavit established probable cause for each of the items listed in the warrant. However, even if the Court finds that the warrant was overbroad, blanket suppression is not the appropriate remedy. Alternatively, the Court should deny the Motion because any contraband not covered by the warrant was properly seized pursuant to the plain view doctrine. Finally, the Court should deny the Motion because law enforcement relied on the warrant in objectively good faith. The Motion for a *Franks* Hearing should also be denied because Defendant has failed to make the required preliminary showings that the alleged omissions were necessary to the finding of probable cause, and that the information was omitted knowingly and intentionally or with reckless disregard for the truth.

## III.    Legal Argument

### A.    The warrant established probable cause to search for firearms, firearm parts, and ammunition; drugs, drug paraphernalia, and money associated with drug trafficking; documents showing ownership or control of the residence; and electronic devices.

The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation." U.S. Const. amend. IV. The Supreme Court has

long recognized that "only probability, and not a prima facie showing, of criminal activity is the standard of probable cause." *Illinois v. Gates*, 462 U.S. 213, 235 (1983) (quoting *Spinelli v. United States*, 378 U.S. 410, 419 (1969)). "The test is whether the sworn allegations are sufficient to warn a man of reasonable caution in the belief that an offense has been committed or is being committed and that evidence bearing on that offense will be found in the place to be searched." *United States v. Clark*, 685 F.3d 72, 75 (1st Cir. 2012) (internal quotations and citation omitted).

To satisfy the Fourth Amendment, "a search-warrant application must reveal probable cause to believe two things: one, that a crime has occurred—a.k.a., the 'commission' element; and two, that specified evidence of the crime will be at the search location—a.k.a., the 'nexus' element." *United States v. Rivera*, 825 F.3d 59, 63 (1st Cir. 2016). In determining whether probable cause exists, the judicial officer reviewing a search warrant application must "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him ... there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. A reasonable belief in the existence of either the "commission" element or the "nexus" element need not be correct, nor need it be more likely true than false. *United States v. Feliz*, 182 F.3d 82, 87 (1st Cir. 1999). A reviewing court "afford[s] an ample amount of deference to the issuing magistrate's finding of probable cause" and "will reverse a finding of probable cause only if [it] see[s] no substantial basis for concluding that probable cause existed." *United States v. Faust*, 853 F.3d 39, 46 (1st Cir. 2017) (internal quotations omitted). In a doubtful or marginal case, the court defers to the issuing magistrate's determination. *United States v. Zayas–Diaz*, 95 F.3d 105, 111 (1st Cir. 1996).

Here, Defendant does not contest that the warrant provided ample basis for a finding of probable cause that a crime occurred. Rather, he argues that the warrant lacked probable cause to support the search of several items listed in the warrant: (1) firearms, firearm accessories, and ammunition (other than the firearm used in the Crown Fried Chicken incident); (2) drugs, drug paraphernalia, and money associated with drug trafficking; (3) records identifying the occupants of the residence; and (4) electronic devices capable of communication.[7] For the reasons explained below, the warrant established probable cause for each of these items.

i. *The warrant established probable cause to search for firearms, firearm parts, and ammunition.*

The warrant established probable cause to search for all firearms, firearm parts, and ammunition. In addition to possessing a firearm, displaying it, and shooting it in the parking lot outside Crown Fried Chicken, multiple witnesses reported that Lobor threated "a mass shooting" and said he had "a bullet for every one." Def. Ex. 2 at 1. These statements, which are included in the affidavit, suggest that Lobor may have had access to more than one firearm and a significant quantity of ammunition. Def. Ex. 11 ¶ 3. This fact alone establishes probable cause to search for all firearms, firearm parts, and ammunition.

In addition, law enforcement did not know what type of firearm was used at Crown Fried Chicken at the time they obtained the search warrant. To the contrary, the affidavit states that the reporting party described the firearm as a black pistol, Witness 1 thought the gun was a "P365 Sig Sauer", another witness said it could have been a Glock pistol, and yet

---

[7]     Defendant also contends that the warrant lacked probable cause to search for financial records and persons within the residence. But no items in these categories were seized, and therefore the Government does not address these items. In addition, Defendant makes a brief argument that the buccal swab for his DNA was improperly included in the residential search warrant because Lobor was in custody at PPD. The Government does not intend to introduce the Defendant's DNA at trial, and therefore does not address this argument.

another witness said it might have been a Ruger or a FN handgun. Def. Ex. 11 ¶¶ 1, 3, 10. Accordingly, the affidavit contained probable cause to search for all firearms, firearm parts, and ammunition. *See United States v. Morris*, 977 F.2d 677, 681 (1st Cir. 1992) ("General descriptions in warrants … have been accepted when the surrounding circumstances render it reasonable"); *United States v. Parker*, 549 F.3d 5, 10 (1st Cir. 2008) (holding that warrant authorizing search of "drugs and guns" was "particularized" and that "far broader classes have been allowed"); *United States v. Poulos*, No. 07-99-P-S, 2008 WL 222272, at *8 (D. Me. Jan. 25, 2008), *report and recommendation adopted*, 2008 WL 619406 (D. Me. Mar. 3, 2008) (holding that warrant for all firearms-related evidence was not overbroad).

      ii.   *The warrant established probable cause to search for drugs, drug paraphernalia, and money associated with drug trafficking.*

The warrant also established probable cause to search for drugs, drug paraphernalia, and money associated with drug trafficking because the affidavit contained information about Defendant's past arrest for drug-related criminal activity. Specifically, the affidavit stated, "Lobor has a prior arrest for Unlawful Possession of Scheduled Drugs." Def. Ex. 11 ¶ 23. A judge found that this amounted to probable cause, and this is not a situation where there is "no substantial basis for concluding that probable cause existed". *Faust*, 853 F.3d at 46 (internal quotations omitted). This is particularly true given the connection between guns and drugs, which has long been recognized by federal courts. *See, e.g., United States v. Lopez*, 649 F.3d 1222, 1242 (11th Cir. 2011) ("[A]s Forrest Gump might say, drugs and guns go together like peas and carrots."); *Del Valle-Hiraldo v. United States*, 2018 WL 11301294, at *7 (D.P.R. Mar. 29, 2018) ("drug trafficking violence and weapons go together like peanut butter and jelly").

9

iii.   *The warrant established probable cause to search for documents showing ownership or control of the residence.*

The warrant also established probable cause to search for documents showing ownership or control of the residence. The affidavit contained ample information that Lobor committed a crime, that he lived at 42 Kellogg Street, and at the very least, that firearms, firearm parts, and ammunition would be found in the residence. Accordingly, law enforcement was also authorized to search for items tending to show ownership or control of the residence, because any such evidence would tend to prove (or alternatively, to disprove) that Lobor possessed the contraband found inside. Indeed, multiple federal courts have upheld provisions of search warrants seeking similar documents. *See, e.g., United States v. Walser,* 275 F.3d 981, 985 (10th Cir. 2001) (upholding warrant authorizing law enforcement to seize "records that show or tend to show ownership or control of the premises"); *United States v. Blakeney*, 942 F.2d 1001, 1026 (6th Cir. 1991) (upholding portion of search warrant authorizing law enforcement to seize "[i]ndicia of occupancy, residency, and/or ownership of premises" and holding that it satisfied the Fourth Amendment); *United States v. Timley*, 443 F.3d 615, 623 (8th Cir. 2006) ("[A] warrant authorizing officers to seize anything related to indicia of occupancy is quite broad"). *See also United States v. Loera*, 59 F. Supp. 3d 1089, 1154 (D.N.M. 2014) (upholding similar provision in search warrant for a computer because such evidence "was essential to establishing who perpetrated the [crime]").

iv.   *The warrant established probable cause to search for electronic devices capable of communication.*

The warrant also established probable cause to search for electronic devices. As discussed above, the warrant authorized the search and seizure of documents establishing ownership or control of the premises; it also authorized the search for documents related to

firearm possession. Def. Ex. 12 at 2-3. Documents related to indicia of occupancy, as well as documentation of the possession of firearms, could be located on any electronic device found inside the residence.

With respect to Defendant's argument that there was no probable cause to search for electronic devices because law enforcement had already obtained information associated with phone number 207-408-8082 from T-Mobile, the presence of the phone itself inside the residence would be evidence that Lobor was at Crown Fried Chicken during the incident. Finally, the fact that a phone was seized from Lobor at the time of his arrest does not render the warrant overbroad. At the time the phone was seized, law enforcement had no way of knowing that the phone was associated with phone number 207-408-8082, and they could not review its contents to confirm without first obtaining a supplemental warrant. *See Riley v. California*, 573 U.S. 373 (2014) (neither officer safety nor destruction of evidence justify dispensing with warrant requirement for review of cell phone data).

> ### v.    *Even if the Court finds that the warrant was overbroad, blanket suppression is not the appropriate remedy.*

Even if the Court were to find that there was no probable cause for certain items listed in the search warrant, blanket suppression is not the appropriate remedy. Under First Circuit precedent, "[t]he remedy in the case of a seizure that casts its net too broadly is ... not blanket suppression but partial suppression." *United States v. Falon*, 959 F.2d 1143, 1149 (1st Cir. 1992) (citing *United States v. Riggs*, 690 F.2d 298, 300 (1st Cir. 1982)). Accordingly, to the extent the Court determines that the search and seizure of certain items was not supported by probable cause, the appropriate remedy is suppression of only those items. *See, e.g., United States v. Daprato*, No. 2:21-cr-00015-JDL-4, 2022 WL 1303110, n. 7 at *8 (D. Me. May 2, 2022) ("if probable cause were missing for some of the categories of information ... [defendant's] requested remedy—suppression of all evidence ... would not be

justified" because "the remedy in the case of a seizure that casts its net too broadly is not blanket suppression but partial suppression"); *United States v. Taylor*, No. 10-86-P-H, 764 F. Supp. 2d 230, 235 (D. Me. 2011) ("if something was seized improperly, the remedy is suppression of that item and perhaps its fruit, not suppression of everything").

### B. Alternatively, the contraband was lawfully seized pursuant to the plain view doctrine.

Even if the Court determines that the search warrant did not contain probable cause to search for illegal drugs, drug paraphernalia, sums of money associated with drug trafficking, or electronic devices, law enforcement lawfully seized these items pursuant to the plain view doctrine. As articulated in *Horton v. California*, 496 U.S. 128 (1990), and *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), law enforcement can seize an item not covered by a search warrant if three standards are met: (1) the officer was lawfully in a place where the object could be plainly seen, (2) the incriminating character of the object was readily apparent, and (3) the officer could lawfully access the object itself. The First Circuit has summarized the doctrine as follows: "[a] law enforcement agent may, without a warrant, seize an object in plain view so long as he or she has (1) lawfully reached the vantage point from which he sees the object, (2) has a right of access to the object itself, and (3) has probable cause to support his seizure of that object." *United States v. Crooker*, 688 F.3d 1, 8 (1st Cir. 2012) (citing *United States v. Paneto*, 661 F.3d 709, 713 (1st Cir. 2011)).

All three requirements articulated by the First Circuit were met when law enforcement seized the drugs, drug paraphernalia, large sums of cash, and electronic devices from 42 Kellogg Street. The officers satisfied the first requirement—lawfully reaching the vantage point from which they saw the items—because they were in the residence pursuant to a search warrant that was supported by probable cause to search for, at the very least, firearms, firearm parts, and ammunition. They also satisfied the second

requirement because firearms, firearm parts, and ammunition could be located in all of the places in which they found the contraband. *See, e.g., Crooker*, 688 F.3d at 8-9 (affirming denial of motion to suppress ammunition and marijuana rolling device because agents were authorized to look in tackle box for items covered by the warrant); *United States v. Ribeiro*, 397 F.3d 43 (1st Cir. 2005) (affirming denial of motion to suppress drugs because officers were authorized to be in bedroom looking for cash and drug-related documents).

Specifically, the items at issue were found between a mattress and box spring (two flip phones), in the pockets of sweatshirts hanging in the closet (plastic baggies containing cocaine and approximately $1,500 in cash), in the seam of a sweatshirt hanging in the closet (plastic baggies containing cocaine and cocaine base), in a lockbox in the closet (plastic baggy containing cocaine), underneath a bedside table (vacuum sealer and vacuum seal bags), on a moving box in the closet (high-capacity kitchen scale), and in the closet shelving (over $7,000 in cash). The agents had a right to access each of these locations because "any container situated within residential premises which are the subject of a validly-issued warrant may be searched if it is reasonable to believe that the container could conceal items of the kind portrayed in the warrant." *United States v. Rogers*, 521 F.3d 5, 9-10 (1st Cir. 2008) (internal citations and quotations omitted). *See also United States v. Ross*, 456 U.S. 798, 820-21 (1982) ("[A] warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found."); *United States v. Johnston*, 784 F.2d 416, 419 (1st Cir. 1986) (officers checking within closed containers that might contain items authorized by search warrant within purview of plain view doctrine). In particular, a single round of ammunition is quite small and could clearly fit in all of these places, including inside the seam of a sweatshirt.

Law enforcement also satisfied the third requirement, because the items were in plain view and the evidence of their illegal activity was immediately apparent. The incriminating nature of evidence is "immediately apparent" if there are "enough facts for a reasonable person to believe that the items in plain view may be contraband or evidence of a crime." *United States v. Perrotta*, 289 F.3d 155, 167 (1st Cir. 2002) (internal citations and quotations omitted). *See also United States v. Giannetta*, 909 F.2d 571, 578 (1st Cir. 1990) (the incriminating nature of evidence is "immediately apparent," if the officer, upon observing it, has probable cause to believe the item is contraband or evidence of a crime). Law enforcement need not be certain that the items are evidence of a crime; rather, "[a] practical nontechnical probability that [it is] incriminating evidence … is all that is required." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (internal quotations omitted).

In this case, plastic baggies of suspected cocaine and cocaine base, large sums of cash, a high-capacity kitchen scale, and a vacuum sealer and sealing bags immediately appeared to be evidence of drug trafficking. *See, e.g., Crooker*, 688 F.3d at 9 (holding that a rolling device immediately appeared to be illegal); *Ribeiro*, 397 F.3d at 52-3 (holding that a bag of white powder, which officers suspected to be drugs, readily appeared to be illegal); *Parker*, 549 F.3d at 10 (noting that officers were entitled to seize guns and illegal drugs if found in plain view); *United States v. Corbett*, No. 1:22-cr-00023-LEW, 715 F. Supp. 3d 126, 142 (D. Me. 2024) (holding that there was a "practical, nontechnical probability" that a large amount of cash in plain view was evidence of drug-related crimes); *see also United States v. $21,510.00 in U.S. Currency*, 144 F. App'x 888, 889 (1st Cir. 2005) (per curiam) ("[a] large amount of hidden currency is strong evidence of … an illicit connection to drug trafficking") (internal citations and quotations omitted). With respect to the kitchen scale

and vacuum sealer, this is particularly true given that they were found in a bedroom (rather than the kitchen), and in close proximity to drugs, large sums of cash, and firearms.

Similarly, given the unusual location of the flip phones (between a mattress and box spring) and their proximity to drugs, drug paraphernalia, large sums of cash, and firearms, there was a reasonable probability that they would contain evidence of illegal drug activity. *See, e.g., United States v. Blanchard*, 544 F. Supp. 3d 166, 171 (D. Mass. 2021) (holding that cell phone was in plain view and lawfully seized, and noting that "cell phones have become important tools … among members of criminal enterprises, and can provide valuable incriminating information") (internal citation and quotations omitted).

### C.  A *Franks* Hearing is not warranted.

A search warrant affidavit is presumptively valid. *United States v. Leonard*, 17 F.4th 218, 224 (1st Cir. 2021). However, under *Franks v. Delaware*, 438 U.S. 154, 155 (1978), "a defendant may request an evidentiary hearing to challenge the truthfulness of statements made by law enforcement agents in a search warrant affidavit." *United States v. Hicks*, 575 F.3d 130, 138 (1st Cir. 2009). At a *Franks* hearing, a defendant must demonstrate by the preponderance of the evidence that the affidavit "contains false statements or omissions, made intentionally or with reckless disregard for the truth, and that a finding of probable cause would not have been made without those false statements or omissions" *Leonard*, 17 F.4th at 224 (internal citations and quotations omitted).

Before being granted a *Franks* hearing, a defendant must first make a "substantial preliminary showing … that a false statement or omission in the affidavit was made knowingly and intentionally or with reckless disregard for the truth *and* that the false statement or omission was necessary to the finding of probable cause." *Id.* (quoting *United States v. McLellan*, 792 F.3d 200, 208 (1st Cir. 2015)) (internal quotations omitted)

(emphasis added). An allegation is made with "reckless disregard for the truth" where the affiant contained serious doubts pertaining to the allegations or where the known circumstances "evinced obvious reasons to doubt the veracity of the allegations in the application." *United States v. Gifford*, 727 F.3d 92, 98 (1st Cir. 2013) (internal citations omitted). With respect to material omissions, the omitted information must be sufficient to "vitiate probable cause" for the purposes of a successful *Franks* challenge. *United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015). In such cases, a negligent omission will not satisfy the strict requisite showing. *Id.* ("[n]egligent omissions – even negligent omissions of highly probative information – do not satisfy this strict standard."). Absent a substantial showing at the outset, a defendant is not entitled to a *Franks* hearing. In addition, the First Circuit has recognized that there "is no requirement that every shred of known information be included in a warrant affidavit," and an omission "triggers the exclusionary rule only if it is designed to mislead, or … made in reckless disregard of whether [it] would mislead the magistrate in his appraisal of the affidavit." *Id.* (internal quotations omitted).

Defendant argues that Detective Curlee's affidavit contained several material omissions, including: (1) Lobor's statement during his interview that the firearm was not in the residence; (2) the K-9 search and metal detector search; and (3) that law enforcement had video footage showing Lobor in possession of a plastic bag left outside of the residence. However, none of these omissions strike at the finding of probable cause. In addition, Defendant has failed to show that any of these alleged omissions were omitted knowingly and intentionally or with reckless disregard for the truth.

      *i.    Defendant has failed to show that the omitted information would have affected the finding of probable cause.*

Defendant is not entitled to a *Franks* hearing because he has failed to show that the alleged omissions would meaningfully alter the determination of probable cause. First, with

respect to Defendant's statement that there was no firearm in the residence, this statement was followed by other statements about the location of the firearm that were vague and contradictory. *See* Gov. Ex. 3 at 17:30-17:31. Most notably, when Detective Googins asked Lobor if he wanted to tell her where the firearm was, noting that he previously said it might have been left outside, Defendant responded, "I didn't say that." Gov. Ex. 5 at 19:32-19:33 (Continued Video of Interview). As a result, when looking at the totality of Defendant's statements, rather than an isolated snippet thereof, they are hardly affirmative regarding the location of the firearm. Therefore, even if they were included in the affidavit, the warrant would still establish probable cause that firearms would be found inside the residence. The fact remains that Lobor resided at 42 Kellogg Street and had not provided law enforcement with the location of the firearm.

Similarly, the inclusion of the fact that law enforcement searched the surrounding area with both a K-9 and a metal detector would not change the determination of probable cause. To the contrary, including this information would arguably enhance the probable cause already contained in the warrant, as it would show that law enforcement had done a careful search of the area and had not found a firearm (making it more likely that firearms would be found inside the residence). Nevertheless, even without this information, the affidavit still contained probable cause that Lobor was identified as the suspect in the Crown Fried Chicken incident, that he had a gun during the incident, and that firearms and other contraband would be found in his residence.

Finally, the fact that law enforcement had video footage showing Lobor in possession of a plastic bag that was left outside the residence would not alter the determination of probable cause. This is because Defendant has not alleged any information showing that law enforcement knew a firearm was inside the bag (or for that matter, even that they knew

about the bag itself).[8] Put simply, the inclusion of the fact that law enforcement had video showing that a plastic bag of no known importance was left outside the residence would have no bearing on probable cause.

> ii.   *Defendant has failed to show that the omissions were made knowingly and intentionally, or with reckless disregard for the truth.*

Defendant is also not entitled to a *Franks* hearing because he has failed to show that the alleged omissions were made knowingly and intentionally or with reckless disregard for the truth. As described above, Detective Curlee had left the still-active scene at 42 Kellogg Street and returned to PPD to draft the warrant before Lobor was arrested. Accordingly, he was not present for the subsequent investigative steps that occurred at the scene. He also was not present for Lobor's interview. Given this, Defendant has failed to allege any facts that would allow the Court to conclude that Detective Curlee was even aware of Lobor's statements or the K-9 and metal detector searches at the time. Without any such evidence, Defendant has failed to make the required showing.

As explained above, Detective Curlee returned to PPD shortly after 4:08 p.m. to draft the search warrant. Def. Ex. 4 at 3. Lobor was arrested at approximately 4:56 p.m. *Id.* at 4. Lobor was transported to PPD, and at approximately 5:26 p.m., Detectives Googins and Rider attempted to interview him. Def. Ex. 8 at 3. During the interview, Detective Googins informed Lobor that law enforcement was already in the process of getting a search warrant. Gov. Ex. 3 at 17:30-17:31. The search warrant was ultimately issued at 6:53 p.m. *See* Def. Ex. 12 at 4. This timeline makes clear that Detective Curlee was finalizing the warrant during Lobor's interview. Given this, Defendant has failed to allege any facts that would allow the Court to conclude that Detective Curlee was aware of Lobor's statements,

---

[8]    Given the investigative steps that law enforcement took to find the firearm, it defies logic that they were aware of the location of the firearm but did not immediately seize it.

much less that he omitted them knowingly and intentionally or with reckless disregard for the truth.

Similarly, as described above, the K-9 and metal detector searches of the area surrounding 42 Kellogg Street occurred during Lobor's interview, while Detective Curlee was finalizing the affidavit and getting it signed by a judge. The K-9 search began at approximately 5:55 p.m., with the metal detector search following. Def. Ex. 10 at 17:55-17:46; Def. Ex. 10A at 17:59, 18:24-18:25, 18:40. Given that Detective Curlee was not present at the scene, and the fact that the warrant was issued at 6:53 p.m., Defendant has failed to allege any facts that would allow the Court to conclude that Detective Curlee was aware of these investigative steps, much less that he omitted them knowingly and intentionally or with reckless disregard for the truth.

Defendant has also failed to allege any facts that would allow the Court to conclude that Detective Curlee was aware of the video footage showing Lobor in possession of a plastic bag that was left outside at the time he drafted the warrant. The relevant video footage was obtained from a surveillance device that Officer Calloway placed outside 42 Kellogg Street at approximately 1:27 p.m. on July 8, 2024. Gov. Ex. 7 at 1 (Off. Calloway Report). After ensuring that the device was working properly, he left the scene. *Id.* Officer Calloway retrieved the device and reviewed the entirety of the video footage after Lobor's arrest, at which time he observed Lobor carrying a plastic bag near the trashcans outside 42 Kellogg Street and subsequently reappearing without the bag. Officer Calloway documented this in a report dated July 11, 2024.[9] Gov. Ex. 7 at 1. Accordingly, Defendant has failed to allege information that would allow the Court to conclude that Officer Calloway was aware of this specific footage at the time the warrant was drafted, much less that he relayed the

---

[9]    Officer Calloway later reviewed the footage again, documenting what he observed in even more detail in a July 17, 2024 report. Def. Ex. 6 (Off. Calloway Supp. Report).

information to Detective Curlee. Therefore, Defendant has failed to show that Detective Curlee omitted this information knowingly and intentionally or with reckless disregard for the truth.

### D. Suppression is unwarranted because law enforcement relied on the search warrant in objectively good faith.

Finally, the evidence should not be suppressed because law enforcement relied on the search warrant in objectively good faith. The Fourth Amendment's prohibition of "unreasonable searches and seizures" protects against unwarranted government intrusions into one's person and property. U.S. Const. amend. IV. "The usual remedy for seizures made with [a defective warrant is suppression] in order to deter future violations of the Fourth Amendment." *See United States v. Brunette*, 256 F.3d 14, 19 (1st Cir. 2001). "However, because suppression can impose a significant social burden, the exclusionary rule is not ironclad." *United States v. Pimental*, 26 F.4th 86, 90 (1st Cir. 2022). "Instead, courts must consider 'the flagrancy of the police misconduct at issue' in deciding whether the exclusionary rule applies." *Id.* "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Davis v. United States*, 564 U.S. 229, 237 (2011). Accordingly, "where an objectively reasonable law enforcement officer relied in good faith on a defective warrant" suppression is unwarranted because in that instance it "would serve no deterrent purpose." *Brunette*, 256 F.3d at 19 (internal citation omitted). Further, "caselaw makes clear that the good-faith exception also applies across a range of cases, including where the alleged error derives from the police rather than the [] issuing magistrate." *Pimentel*, 26 F.4th at 90 (internal citations and quotations omitted); *see also Herring v. United States*, 555 U.S. 135, 147 (2009) (holding that the good-faith exception may apply "when police mistakes are the result of negligence"). "[W]hen the police act with an objectively reasonable good-faith belief that their conduct is lawful … or when their

conduct involves only simple, isolated negligence," the exclusionary rule does not apply. *United States v. Levin*, 874 F.3d 316, 322 (1st Cir. 2017) (internal citations and quotations omitted).

The Supreme Court clearly delineated the bounds of the good faith exception in *United States v. Leon*, 468 U.S. 897 (1984). Pursuant to *Leon*, suppression is appropriate where (1) the judge issuing a warrant was misled by information in an affidavit that the affiant knew was false; (2) the issuing magistrate wholly abandoned his judicial role; or (3) the officer executing the search warrant relies on an affidavit "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Id.* at 923. None of these circumstances are applicable here, and therefore suppression is not warranted.[10]

For the reasons discussed above, the judge issuing the warrant was not misled by information that Detective Curlee knew to be false. Nor was the warrant so lacking in probable cause as to make reliance upon it entirely unreasonable. To the contrary, the search warrant contained significant facts regarding Lobor's involvement in the Crown Fried Chicken incident, stated that Lobor had a prior arrest for drug possession, and clearly established Lobor's connection to 42 Kellogg Street. Accordingly, the officers executing the search warrant objectively believed that the warrant authorized them to search for all the items listed in the warrant. As *Leon* and its progeny make crystal clear, suppression is inappropriate when the police act with an objectively reasonable, good-faith belief that their conduct is lawful.

---

[10]    Defendant does not argue that the judge issuing the warrant wholly abandoned his judicial role, and therefore the Government does not address that argument.

## IV.    Conclusion

For the reasons stated above, Defendant's Motion to Suppress and Motion for *Franks* hearing should be denied. Although the Government asserts that the Defendant has not made the requisite showing for a *Franks* hearing, the Government does not oppose a hearing on the Motion to Suppress.

Date: January 31, 2025                          Respectfully submitted,

                                                DARCIE N. MCELWEE
                                                United States Attorney


                                                */s/ Shira Furman*
                                                SHIRA FURMAN
                                                Assistant United States Attorney
                                                U.S. Attorney's Office
                                                100 Middle Street
                                                Portland, Maine 04101
                                                (207) 780-3257
                                                Shira.Furman@usdoj.gov

22

## CERTIFICATE OF SERVICE

I hereby certify that on January 31, 2025, I filed the foregoing GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS AND MOTION FOR FRANKS HEARING using the Court's CM/ECF system, which will cause a copy to be sent to all counsel of record.

DARCIE N. MCELWEE
United States Attorney

by:     */s/ Grace Herrick*
GRACE HERRICK
Paralegal Specialist

on behalf of:   SHIRA FURMAN
Assistant United States Attorney
U.S. Attorney's Office
100 Middle Street
Portland, Maine 04101
(207) 780-3257
Shira.Furman@usdoj.gov

23