| | | |
|---|---|---|
| Det. A. Curlee | Portland Police Department CID | 24-035450 |
| | Initial Investigation-Photo Array-Interviews | |

Exhibit 2

On July 6, 2024, at approximately 1259 hrs., I (Det. A. Curlee 821) received a call from Det. Sgt. M. Rand in regards to the shooting that occurred at 408 Forest Ave on July 6, 2024 at 408 Forest Ave. Det. Sgt. M. Rand advised that Det. Lt. Goodman after reviewing images distributed by Ofc. Cannell of the suspect, believed that the suspect was Anthony Lobor. Det. Sgt. M. Rand requested that I respond to Police Headquarters to start the investigation into the incident.

At approximately 1430 hrs., I met with Det. Googins who was working on a photo array. In order to conduct a double-blind photo array, I did not assist Det. Googins with the photo array.

I located the witness statement [Witness 1] completed in order to locate a phone number for the victim. At approximately 1459 hrs., I called the phone number [Witness 1] provided on the witness statement and left a voice mail.

At approximately 1515 hrs., I called [Witness 2] who was listed as witness-01 in the report. I spoke with [Witness 2] over the phone briefly about the incident. (*The audio recordings are attached to this case file; the recorder broke the conversation into several individual audio files*.)

At approximately 1526 hrs., I called [Witness 3] who was listed as witness-02 in the report. I left a voicemail requesting a call back.

At approximately 1532 hrs., I received a phone call from [Witness 1]. [Witness 1] advised that he believed that he could identify the suspect if shown a series of photos and agreed to drive to PPD. I requested that he try to facilitate providing a ride for [Witness 2] who did not have a way to get to PPD.

At approximately 1535 hrs., I received a phone call from [Witness 3]. I asked [Witness 3] if he had spoken with [Witness 1], and he advised that he had just spoken with him. I asked if he would be willing to come to PPD with [Witness 1] and [Witness 2] to look at a series of photos.

At approximately 1546 hrs., I received a phone call from [Witness 1] advising that they were on the way to the PPD.

Det. Googins completed three photo arrays with a picture of the suspect. The photo arrays were placed in individual folders which were brand new and had no markings to distinguish between the folders. The photo arrays were arranged in a separate order so the picture of the suspect had a different number and placement in the array. I did not preview the photo array's and I did not know the placement of the suspect's photo in the array prior to the interviews. I did not know who Anthony Lobor was and had not viewed a photo of him, prior to the interview.

| | | |
|---|---|---|
| Det. A. Curlee | Portland Police Department CID | 24-035450 |
| | Initial Investigation-Photo Array-Interviews | |

At approximately 1615 hrs., I received a phone call from [Witness 1] advising that they were at PPD.

I proceeded to the first-floor interview room and placed the three photo array packets on a table outside the interview room prior to meeting [Witness 1], [Witness 3], and [Witness 2] in the lobby. I went into the lobby and met with [Witness 1], [Witness 3], and [Witness 2]. I provided [Witness 3] and [Witness 2] with witness statement forms as they had not previously completed ones. I then advised [Witness 1], [Witness 3], and [Witness 2], that I would be taking them into the interview room one at a time for the photo array. I let them know that once the process was completed they were to exit the lobby and refrain from discussing the interview and photo array.

The interview with [Witness 1] was conducted first. Once [Witness 1] was in the interview room, I retrieved the photo array packets and placed them on the table. I informed [Witness 1] that he was being recorded, that he could leave at any time, and did not have to answer questions. I then asked [Witness 1] to tell me about the incident. The following is a transcribed summary of the conversation (*the summary is a rough transcription and has not been verified*):

- [Witness 1]
    o Yeah, so, um, we got into CFC and it was, there's only like three other people in there. When we got in, um, we ordered our food, sat down, and all of a sudden tons of people came in, you know, I don't know, 15 or so, maybe a little less. Um, and so we're all kinda waiting. Everyone's on their phone, so I'm just waiting because I can't really see past everybody when the food's coming out. So I'm, we're waiting, I'm sitting there and, uh, some guy had yelled something like, f I know you from, or something like that, you know, and I was like, what? You know? And I didn't know if he knew me and was trying to, you know, to like me or something. Um, and he said a few other things. So I stood up and his buddy said like, Hey, he's got, he, you know, saw he got a gun, something he's, you know, he's effed up and then he kept threatening everyone. So I'm trying close enough to him to where, you know, I could grab him if he can shoot somebody, you know. Um, and so I got close to him. He was yelling about shooting or I got a bullet for everybody and kind of yelling, threats. Everyone would come in and tell him, chill he is. No, it's gonna be a mass shooting, here. You everybody keeps trying to save him or, you know, something like that. Um, that kind of continued. And then some guy had reached for it almost, you know, and he, that's when he flinched and was trying to grab it and I saw the full handle and everything. Um, and he, then he had a mass shooting again. Um, it's, it's hard to remember everything. Um, and then, whatever happened after that, he had gone around. He had hit some, hit my but up buddy of mine in the face, kind of, you know, threatening continue to threaten and then other guy came in with his other friend, dragged him out. Um, that's kind of the best I can say.
- Det. Curlee
    o In your statement, you mentioned you were scared?

| Det. A. Curlee | Portland Police Department CID | 24-035450 |
|---|---|---|
| | Initial Investigation-Photo Array-Interviews | |

- [Witness 1]
  - Yeah. Oh yeah. I think everyone was, yeah.
- Det. Curlee
  - Did you think he was gonna…
- [Witness 1]
  - Uh, I was, there was a point when he started to get really, you know, wild where I thought for sure someone like we were gonna shot, you know? I did.
- Det. Curlee
  - Do you remember what he said?
- [Witness 1]
  - He said like, you, like, there's gonna be a mass shooting. I got one bullet for everybody like this or that, or, you know, shoot kind of hand fingers, whatever, um, I'm gonna shoot you say, say, say, say something or I'm gonna pop you whatever. You said something, you know, in that manner. Um, he kept grabbing on it and stuff. Um, it showed it multiple times, you know, I saw it plethora of times.

Once the interview was completed, I pulled the photo array instructions out of a folder and read the instructions to [Witness 1]. I then asked [Witness 1] to read the instructions and initial the form indicating that he had read the instructions. I reminded him to look at all of the photographs and then I handed him the folder containing the photo array. [Witness 1] looked at all of the photos and selected photograph #4 (Anthony Lobor's photo was #4 in this photo array). [Witness 1] stated that he was 100% sure it was the individual shown in photograph #4. I asked [Witness 1] to circle the number 4 and sign his name next to it. I then took the photograph, placed the case number, date and time on the top of the photo. [Witness 1] then completed the remainder of the photo array form. I placed the completed photo array folder on the chair next to me, so that it could not be used a second time. I then reminded [Witness 1] to not discuss the photo array or statements that he made with [Witness 3] and [Witness 2]. I asked [Witness 1] to exit the lobby without speaking to [Witness 3] and [Witness 2] and proceed to his vehicle to wait for them.

In the lobby, I informed [Witness 3] and [Witness 2] that [Witness 1] would wait for them in the car. I found that [Witness 3] had not started to fill out the written portion of the witness statement and that [Witness 2] almost done completing his. I asked [Witness 3] to view the photo array, while [Witness 2] finished his statement. Once the photo array was complete, [Witness 3] would return to the lobby to finish his witness statement, while [Witness 2] completed the photo array and witness statement.

[Witness 3] was escorted to the interview room and I informed him that he was free to leave and he did not have to answer any questions. I read the photo array instruction form to [Witness 3] and then asked him to read the instruction form, initial that he had read the instructions. I asked [Witness 3] to look at all photos prior to making an identification. [Witness 3] was then handed the photographs in the photo array. [Witness 3] looked through all of the photographs and selected photograph #6 (Anthony Lobor's photo was #6 in this photo array). I asked [Witness 3] to circle the number and sign his name next to it. I then took the photograph, placed the case number, date

USAO-000474

| Det. A. Curlee | Portland Police Department CID | 24-035450 |
|---|---|---|
| | Initial Investigation-Photo Array-Interviews | |

and time on the top of the photo. [Witness 3] wrote on the form that he was 100% sure it was the individual shown in photograph #6. I then escorted [Witness 3] to complete the witness statement in the lobby.

[Witness 2] was escorted to the interview room and I informed him that the interview was being recorded, he was free to leave, and he did not have to answer any questions. I read the photo array instruction form to [Witness 2] and then asked him to read the instruction form, initial that he had read the instructions. I asked [Witness 2] to look at all photos prior to making an identification. [Witness 2] was then handed the photographs in the photo array. [Witness 2] started to look through the photographs and stopped on photograph #3 (Anthony Lobor's photo was #3 in this photo array). [Witness 2] (pointing at the picture) "yeah, him right here". [Witness 2] then went on to explain that why he selected photograph #3. [Witness 2] then looked at the remaining photographs, and then confirmed that he was selecting photograph #3. I asked [Witness 2] to circle the number and sign his name next to it. I then took the photographed, placed the case number, date and time on the top of the photo. [Witness 2] wrote on the form that he was 100% certain it was the individual shown in photograph #3.

I then asked [Witness 2] to discuss the conversation we had earlier. The following is a transcribed summary of the conversation (*the summary is a rough transcription and has not been verified*):

- [Witness 2]
    - Yeah, kind of just like summarize it. Yep. Yeah. Um, basically I had said that we were, uh, waiting for food when I heard in a very confrontational tone, like, who are you looking at? Like, how do I know you? Um, that's when I was like looking around and I saw him looking right over my head. So, I turned around and I see Will looking at him like, what, what are you talking about? And then, um, and then Will gets up to go like, ask him like, like, what are you talking? I wasn't staring at you. Um, I didn't really hear, it was just a bunch of like, blur kind of. Um, but I just, he was basically just yelling about like, what are you looking at? I'll, I'll fight you whatever, like I'll f you up. Stuff like that. Um, and then we saw him like gripping his waist for a while. And even George was saying this, like, we looked down at his waist at his hand, and there we didn't see a gun at all. But then at one point we looked down, like literally like a minute later we looked down his hand, same spot, but this time he's got a gun in his hand. And so, at that point we all kind of like took a step back and we're like, all right, let's just not get shot. Um, but um, but yeah, basically the entire time, his buddy, the shorter guy, I believe he had dreads. Um, it was just like trying to get in between the, the taller guy and Will. I was just like, yo, like he's drunk, whatever, like he's got a gun, just leave him alone, blah, blah, blah. Well, behind him, obviously this guy's just rambling on. Um, and he ended up doing the whole finger gun thing where he is like, I get a bullet for all of you. 'Cause we were in the back, obviously we all stood up 'cause like it's just a con, we don't know what's going on. Um, and so he goes like, I get a bullet for all of y'all. Um, finger gun, you know, b ba b points at all of us individually. Um, his buddy ends up like pushing him away from the main group over by the register. And that's when he kind of steps away and then corners Nico into the, uh, corner of the railings, starts yelling in his face and he strikes

| Det. A. Curlee | Portland Police Department CID | 24-035450 |
|---|---|---|
| | Initial Investigation-Photo Array-Interviews | |

    Nico in the face of his hand real quick. And then like steps away, like steps away from Nico, turns back towards the main group at the register and then grips the gun again. And then just starts like playing with it. And his, I don't know, he was just like, he never like pulled it out above his waist, but it was like very, like I told you on the phone, maybe like an inch of the barrel left in his pants.  Um, and then they ended up getting him out. I believe his buddies just like pushed him out or dragged him out, whatever. And then, uh, a minute after that I saw blue lights and then some people came in were like, yo, did you guys hear that shots? Um, we didn't, but uh, yeah, that was basically it af after he left, we just continued waiting for our food. Um, yeah, that's

- Det. Curlee
    - Did you hear anything outside the restaurant?
- Witness 2
    - No, actually no. Actually, they came in and were like, Hey, did you guys hear the shot? And we were like, no, what shot? So, we were actually really confused about it as well.
- Det. Curlee
    - What did the handgun look like?
- Witness 2
    - I mean, I'm not very experienced with handguns to be honest. It just looked like a regular black, could have called it a Glock or anything. Um, I just, black handle black mag didn't look extended or anything like that. Um, it didn't look to have a laser on it or any attachments for that matter. It looked just very stock, um, looked almost like a, um, looked almost like a high point or, uh, or, um, not a, I don't know, I forget, but just pretty typical gun. I don't know for sure. Exactly.
- Det. Curlee
    - So, automatic, revolver?
- Witness 2
    - Oh, um, just a semi-automatic, um, uh, mag fed, like probably 12 round mag, like, uh, like a standard Glock pretty much.
- Det. Curlee
    - And the person that did this is the person that you identified in the…
- Witness 2
    - Yes.

I escorted Witness 2 to the lobby and then escorted Witness 3 to the interview room to conclude the interview.  I advised Witness 3 that he was being recorded and that he was free to leave at any point.  Witness 3 completed the remainder of his witness statement prior to the interview.  The following is a transcribed summary of the conversation (*the summary is a rough transcription and has not been verified*):

- Det. Curlee
    - Did you see a gun?
- Witness 3
    - Yes. Uh, not the full gun, but he was, he had a full grip on it with one hand and was kind of jostling it around in his pants. Okay.
- Det. Curlee
    - How do you know it was a gun?

USAO-000476

Det. A. Curlee | Portland Police Department CID | 24-035450
Initial Investigation-Photo Array-Interviews

- Witness 3
  - I saw the rear sight on it and the majority he had it, he had his just the barrel tucked into his pants. That's as far out as he brought it. Just by visual inspection,
- Det. Curlee
  - What, what type of gun or what did it look like?
- Witness 3
  - Um, nothing too fancy. It looked like a, maybe a Ruger or a FN, something chunky.
- Det. Curlee
  - Uh, what color?
- Witness 3
  - Black
- Det. Curlee
  - Pistol. Revolver?
- Witness 3
  - Pistol.
- Det. Curlee
  - Semi-Automatic?
- Witness 3
  - Yep.
- Det. Curlee
  - Um, now I know you've written it and it sounded redundant. Do you mind walking me through this verbally?
- Witness 3
  - Yeah, no problem. We were, we had ordered, we were sitting down, this individual walked in with friend, acquaintance, acquaintance, a whole, another flood of people walked in. We were sitting there, they had ordered standing, we were sitting looking, waiting for our food. They were in between us and the counter, and the gentleman behind the counter. The one individual looked at it was me, and then Will was in front of me. I had my back up against the wall looking towards the counter. He looked at Will and said, where do I know you from in a normal tone of voice. And then progressively he said it a couple more times. Will got up. They were having a conversation, I didn't hear what they were saying. And then it escalated to the point of other people started to stand up and he was getting concerned that we were standing up and trying to fight him. He was very, what do you say? Uh, defensive. And it was just verbal argument of he was gonna, he could take all of us, he could. Where do we know him from? Why were we staring at him? And then from that point, he's, I can take all of you, I have bullets for all of you. One of the gentlemen that walked in just after him and said, Hey, don't worry about it. He is like, no, I got some for you too. This'll be a mass shooting. And someone, his acquaintance that he had walked in with came and tried to usher him out. He had started walking out at that point, I had gotten up, some of our food was ready, I was distributing it to everyone else that

- was in the discussion area. His friend tried to usher him out. That was when he got really disgruntled and started really grabbing onto it the whole time. He was just fiddling with his waistband. And this is when he started showing it to us. And then our other friend who isn't here today, he was down back by the table and he went up, got in his face and said, what are you gonna do about it? Gave him a little nut, I wouldn't say punch him, but just a little tap in the face and then continued to come back towards us with the firearm. And then turned around, went outside, we didn't hear anything. And then the flood of people that had rushed outside to get away from it came back inside and said that he had discharged it on the street. And then we waited for our food and that was it.
- Det. Curlee
  - Okay. Um, did you, were you scared? Did you think he was gonna shoot anybody or?
- Baiguy
  - I was that I, I was very confident that he was about to at a couple points and he, he looked very mentally scared or not scared, but just out of control. Aggressive.

After the interview, I escorted [Witness 3] to the lobby. I observed the [Witness 2] was in the lobby and I inquired about [Witness 1]. I was advised that [Witness 1] had to return home and that [Witness 3] and [Witness 2] would be finding another ride to get back home. I returned to the interview room and retrieved the three photo array packets and witness statements.

 I met with Det. Googins to show her the results of the photo array and advise her that [Witness 1], [Witness 3] and [Witness 2] had selected the same photograph. Det. Googins advised that the photograph that all three had selected was the picture of Anthony Lobor.

 Det. Googins began to work on obtaining an arrest warrant for Anthony Lobor and I began to work on identifying cellular numbers for Anthony Lobor.

 A ProPhoenix entry for Anthony Lobor listed 207-408-8082 as the cellular number for Anthony Lobor. A search in database Accurint for Law Enforcement reflected that 207-408-8082 was registered to Anthony Lobor and was a T-Mobile number.

 *I applied for and was a granted a search warrant by Justice of the Peach Schwartz for T-Mobile cellular number 207-408-8082. The search warrant was served to T-Mobile on July 6, 2024. (After the warrant was served to T-Mobile, I found that I had transposed the cellular number in two parts of the affidavit. I submitted an addendum affidavit and addendum to the search warrant to Justice of the Peach Schwartz who granted the addendums. The typos did not affect the search warrant and the cellular number was correct in the search warrant.)*

 Further action related to this investigation will be documented in additional supplements.

*[signature]* 7-19-24