UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 2:24-cr-00134-LEW |
| | ) | |
| ANTHONY LOBOR, | ) | |
| | ) | |
| Defendant. | ) | |

### ORDER ON DEFENDANT'S MOTION TO SUPPRESS

Defendant Anthony Lobor is charged, by an Indictment dated November 20, 2024 (ECF No. 29), with Possession with Intent to Distribute Cocaine and Possession of Firearms in Furtherance of Drug Trafficking.  Mr. Lobor became the target of a law enforcement investigation after allegedly brandishing a firearm and threatening patrons of a restaurant in Portland, Maine, before firing a round into the pavement of the establishment's parking lot on July 6, 2024.

The matter is before the Court on the Defendant's Motion to Suppress (ECF No. 41) the fruits of a search of his residence conducted pursuant to a search warrant.  Because the warrant was supported by probable cause to search for the handgun, ammunition, and clothing associated with the incident under investigation, and because controlled substances, numerous firearms, and quantities of cash were discovered in plain view, the Motion to Suppress is DENIED.

1

## BACKGROUND

The following facts have been drawn from evidence presented at the hearing held on October 8, 2025, and from the parties' filings. At 1:50 a.m. on July 6, 2024, Portland Police responded to reports of a disturbance at Crown Fried Chicken in Portland. Witnesses described an altercation involving an armed man in a gray sweatshirt who had threatened to shoot people. Witnesses also reported that, after the man left the restaurant, they heard a gunshot. In the parking lot outside the restaurant, officers located a FN 5.7 x 28 mm shell casing and noted a divot in the pavement consistent with a firearm having been discharged. From surveillance footage, an officer who was familiar with the Defendant and the Lobor family from an unrelated case tentatively identified the man in the gray sweatshirt as Anthony Lobor.

Later that day, Detectives Googins and Curlee were assigned to the investigation. The detectives prepared a double-blind photo array, from which three witnesses identified Anthony Lobor as the man who had brought a firearm to Crown Fried Chicken the night before. With this information, Det. Googins began working on an arrest warrant, which was granted, and Det. Curlee applied for and received a search warrant for T-Mobile's location data for a phone number that law enforcement records indicated belonged to the Defendant.

Det. Curlee downloaded and reviewed the data from T-Mobile on July 8. This data indicated to him that the cellular device associated with the phone number was in the area of Crown Fried Chicken around the time of the incident. T-Mobile also provided "location pings" at 10-minute intervals starting the night of July 6, although gaps in the data meant

that Det. Curlee did not have location information for the device between approximately 10:17 p.m. on July 6 until 2:08 p.m. on July 8.

Just before 1:30 p.m. on July 8, another Portland police officer set up a "hermit" camera across from 42 Kellogg Street—the address listed on Anthony Lobor's driver's license, where detectives believed he resided. Although officers have the ability to remotely monitor the footage that the camera records live, that is not what happened here.[1] Officer Calloway, who had been asked to set up the camera on his day off, testified that he checked the feed periodically, but did not monitor the footage continuously. *See* Hr'g Tr. 50:21-51:9. Neither did any other officer involved in the investigation. At 4:19 p.m., the camera recorded the Defendant walking past the front of 42 Kellogg Street carrying a white plastic shopping bag in the direction of garbage bins outside of the residence (which were out-of-frame) and then go through the front door of 42 Kellogg Street without the bag. *See* Gov't Ex. 5A. Officer Calloway testified that he did not see this happen, nor did he observe the Defendant with the white bag at any other time that afternoon when he periodically checked in on the camera feed. Hr'g Tr. 50:6-17. He did not review the recorded footage in full until the following day (July 9).

Based on a location ping received at 2:08 p.m. on July 8 that placed the cell phone within an approximately 3.7-mile radius that included 42 Kellogg Street, Det. Curlee believed that the Defendant might be at his home. *See* Rep. of Det. Curlee at 2 (Def. Ex. 3). Officers began surveilling 42 Kellogg Street in person. At around 3:00 p.m., Officer

---

[1] Officers testified that while live surveillance is one purpose to which the hermit camera can be put, it is also used to "develop a pattern of activity" or "pattern of life" for the suspect under surveillance. *See, e.g.*, Hr'g Tr. 58:5-7, 73:25-74:7.

Dyer observed a group of five men exit 42 Kellogg Street and recognized two men in this group from Crown Fried Chicken's security footage, including the Defendant.  Officer Dyer asked Det. Curlee and Det. Sgt. Rand to come to Kellogg Street and confirm the identification, which they did.  The men got into two nearby cars—a white Kia and a black Mercedes—and drove away.  Officers tried to follow, but did not know which car Mr. Lobor was in, and eventually lost track of both vehicles when they split up and went in different directions.  Officer Dyer returned to Kellogg Street to continue surveillance.  Det. Curlee and Det. Sgt. Rand thought one of the vehicles may have been heading to North Yarmouth and started driving in that direction.   At 4:08 p.m., Det. Curlee received a location ping from T-Mobile indicating that the Defendant's cell phone was in Portland, and abandoned the venture up to North Yarmouth in favor of returning to Portland.[2]  Det. Sgt. Rand dropped Det. Curlee off at the police station, and then returned to 42 Kellogg Street.  At the station, Det. Curlee began working on an application for a warrant to search 42 Kellogg Street.

Officer Dyer, who had reestablished surveillance at 42 Kellogg Street, observed the black Mercedes return to the area and saw Mr. Lobor exit the vehicle.  He did not see Mr. Lobor carrying a white plastic bag, but his vantage point did not provide an unobstructed view.  Around 4:35 p.m., Mr. Lobor and one or two other people left 42 Kellogg Street and

---

[2] Although Det. Curlee had received a ping at around 2:08 p.m. indicating that the Defendant's device was within an approximately 3.7-mile radius that included Portland, part of South Portland and part of Falmouth, he did not receive any additional location information until the 4:08 p.m. ping, which encompassed a smaller geographic radius in Portland (but did not include 42 Kellogg Street).  Rep. of Det. Curlee at 1-4 (Def. Ex. 3).  Subsequent pings received over the next hour placed the device within an approximately 2.5-mile radius that included 42 Kellogg Street.  *Id.*

walked to a nearby parking lot.  Approximately twenty minutes later, officers approached Mr. Lobor, who fled.  After a brief foot chase, he was apprehended and taken into custody.

At the station, Det. Googins informed Mr. Lobor of his *Miranda* rights and started to question him.[3]  During this interview, Mr. Lobor learned that law enforcement was planning to apply for a warrant to search his home for a firearm.  *See* Gov't Ex. 6-1A (17:30:30-17:33:00).  Upon learning this, he asked Det. Googins if they were looking for a weapon, and if they would still search his home if they found the weapon.  *Id*.  Det. Rider, who was assisting with the interview, said they would still search for other items, such as receipts for weapons and ammunition.  *Id*.  Mr. Lobor then said, "What if I had it on me and it fell, and then you found it?"  *Id*.  Det. Googins asked the Defendant if he wanted to tell her where the firearm might be, and he responded, "Mostly likely, yeah."  *Id*.  Det. Googins repeated the question, and the Defendant replied, "Right outside in front of the— um, can I talk to a lawyer, actually, before?"  *Id*.  Det. Googins told Mr. Lobor that he probably would not get a lawyer until he was charged.  *Id*.  Eventually, however, another detective put Mr. Lobor in contact with an attorney.  Following a private phone call with this attorney, Mr. Lobor informed detectives that he was invoking his right to remain silent. At around 7:30 p.m., Det. Googins explained that because Mr. Lobor suggested a firearm might be outside, and this posed a threat to public safety—especially considering the presence of young children in the neighborhood—she was going to continue questioning. *See* Gov't Ex. 6-2A (19:32:35-19:33:49).  The Defendant denied having said that the gun was outside, and told Det. Googins that his lawyer said not to say anything else.  *Id*.

---

[3] Defendant's Motion does not seek suppression of any statements.

Officers at the scene searched with a metal detector and search dogs outside of 42 Kellogg Street for a firearm the Defendant may have discarded while fleeing. This search recovered a cell phone, but no firearm.

While all of this was ongoing, Det. Curlee put together an application for a warrant to search 42 Kellogg Street and two vehicles (the black Mercedes and a gray Hyundai, which belonged to "an associate" of the Defendant). *See* Aff. of Det. Aaron Curlee (Gov't Ex. 7B). In support of this application, Det. Curlee attested to the following facts as the basis for probable cause:

- On July 6, 2024, at approximately 1:50 a.m., Portland Police responded to a disturbance at Crown Fried Chicken. The individual reporting the disturbance described "a black male wearing a grey [*sic*] sweatshirt [who] was trying to fight people" and "had a black pistol." Aff. ¶ III.1.

- Officers at the scene "learned that a pistol round had been discharged in the parking lot and located a bullet defect in the asphalt and one FN 5.7 x 2.8mm shell casing." Aff. ¶ III.2.

- Officers located a victim and two witnesses, who said "the suspect" entered the restaurant, started to argue with the victim, said he had a gun, lifted his shirt to expose a handgun, and said that "there was going to be a 'mass shooting in here'" and "I got a bullet for every one of you." Aff. ¶ III.3. The victim said he thought the gun was a "P365 Sig Saur" [*sic*]. *Id*. Officers reviewed security footage of the incident which showed the suspect "holding his right hand in a manner consistent with holding or securing a large heavy object in his waistband." Aff. ¶ III.4.

- Det. Lt. Goodman tentatively identified the suspect as Anthony Lobor from a screenshot. Aff. ¶¶ III.5-6.

- The victim and two witnesses "identified Anthony Lobor as the person that threatened [the victim] with a handgun" from a double-blind photo array. Aff. ¶¶ III.7-9.

- Both witnesses "advised that they saw Anthony Lobor holding a handgun" and "described the handgun as a black in color semiautomatic handgun." Aff. ¶ III.10. One witness "said the handgun could have been a Glock pistol," while the other "said it might have possibly [been] a Ruger or FN handgun." *Id*.

- Portland Police Department and Accurint records listed Anthony Lobor's cell phone number. Aff. ¶¶ III.13-14. In response to a search warrant for records and location

data, T-Mobile provided records showing that the number in question was registered to Lily Lobor. T-Mobile also provided records indicating that "[t]he device associated with" that cell phone number "was in the area of the address of occurrence at the time of occurrence" and "[a] location ping . . . at 1404 hrs.," which "showed the device in the area of 42 Kellogg St." Aff. ¶¶ III.15-19.

- "Law enforcement records indicate that Anthony Lobor provided 42 Kellogg St. as his address," and officers "conducting surveillance in the area of 42 Kellogg St. observed a male that appears to be Anthony Lobor, outside of 42 Kellogg St., as well as going in and out of the residence." Aff. ¶¶ III.20-21.

- An arrest warrant for Anthony Lobor issued on July 8, 2024, for "Criminal Threatening with a Dangerous Weapon, Threatening Display of or Carrying a Concealed Weapon, and Violation of Conditions of Release." Aff. ¶ III.22.

- "Anthony Lobor has a prior arrest for Unlawful Possession of Scheduled Drugs." Aff. ¶ III.23.

- "Anthony Lobor was apprehended after fleeing the residence by the Portland Police Department." Aff. ¶ III.25.

The affidavit also included information about two vehicles: one that was "black in color" with an expired registration and a gray Hyundai belonging to Nicole Perry, "an associate of Anthony Lobor." Aff. ¶¶ III.24, 26.

From these facts, Det. Curlee sought authorization to seize the following categories of items:

- Firearms, components of firearms, ammunition, firearm parts and accessories, and documentation related to firearm possession. Aff. ¶¶ II.B.4-8.

- Clothing associated with the July 6 incident. Aff. ¶ II.B.11.

- Scheduled drugs (namely, cocaine, fentanyl, and methamphetamine), drug paraphernalia, and sums of money obtained from the sale of scheduled drugs. Aff. ¶¶ II.B.16-18.

- Samples or suspected biological materials and hairs, fibers, or other trace evidence that could be examined for a DNA profile. Aff. ¶¶ II.B.12-14.

- Records relating to the purchase of financial instruments or the transfer of funds. Aff. ¶ II.B.10.

- Documents or personal property tending to identify the person or persons who owned, occupied, or resided in the premises searched. Aff. ¶¶ II.B.9, 15.

7

- Electronic devices capable of communication through cellular or Wi-Fi connections attributable to Anthony Lobor.  Aff. ¶ II.B.3.

- A buccal swab from Anthony Lobor to compare his DNA to a sample obtained from shell casings recovered at the scene.  Aff. ¶ 11.B.1.

- Any persons located within the structure.  Aff. ¶ 11.B.2.

A state district court judge approved the search warrant at around 7:00 p.m. on July 8.  *See* Search Warrant (Gov't Ex. 7A).  Det. Curlee returned to 42 Kellogg Street to execute the warrant.  The search of 42 Kellogg Street and the two vehicles that followed was thorough, but the only evidence that was seized from inside the house was found in two bedrooms on the second floor.

From the southwest bedroom, officers seized a rifle and several magazines in a firearms case on the floor of the closet; a multicaliber rifle that was under the bed; a small caliber pistol in a bag on the closet floor; two magazines in a bag on the closet floor; a 5.7 x 28 mm FN cartridge on the bottom shelf of the closet; a buffer tube and spring consistent with an AR-15 from a basket under a bedside table; three empty firearms cases and several cartridges in a bag under the bed; a plastic bag containing cocaine from a lockbox in the closet; two plastic bags containing cocaine from the pocket of a gray sweatshirt that was hanging in the closet; two plastic bags containing cocaine and cocaine base that were sewn into the hem of same sweatshirt; $476 in cash, from a pocket in the same sweatshirt; $1,039 in cash, from the pocket of a green sweatshirt hanging in the closet; two flip phones from in between the mattress and the box spring; and several documents in Anthony Lobor's name.  *See* Master Evid. List (Gov't Ex. 4A); Rep. of Det. Curlee at 6-8 (Def. Ex. 3).  Officers also found and photographed a box for a kitchen scale, a vacuum sealer, and vacuum seal bags, but did not seize these items.  *See* Hr'g Tr. 143:8-16.

From the northwest bedroom, officers seized a pistol and magazine from the pocket of a coat hanging in the closet; a pistol from the closet; a multicaliber rifle and multicaliber pistol that were under the bed; a handgun magazine with ammunition in the closet; and $7,786 in cash from the closet shelving.  *See* Gov't Ex. 4A; Def. Ex. 3 at 5-6.

After the search of the house was complete, Det. Sgt. Rand and Det. Curlee started searching two trash cans outside of the residence.  Def. Ex 3 at 8.  While Det Sgt. Rand searched one trash can, an officer who had been stationed outside the front entrance to 42 Kellogg Street pointed out a white plastic bag hidden behind the second trash can.  *Id*.  The officer picked up the bag and saw a black handgun.  *Id*.  The bag also contained empty bottles, items of clothing, and a blue iPhone.  *See* Gov't Ex. 4A (JAB38).

## DISCUSSION

The Fourth Amendment provides that no search warrant "shall issue, but upon probable cause," and that any warrant that does issue must "particularly describ[e] the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.  The probable cause standard "is not a high bar," requiring "only the kind of fair probability on which reasonable and prudent people, not legal technicians, act."  *United States v. Cortez*, 108 F.4th 1, 8 (1st Cir. 2024) (cleaned up).  The search warrant application must demonstrate probable cause to believe (1) that "a crime has been committed—the 'commission' element," and (2) that "enumerated evidence of the offense will be found at the place searched—the so-called 'nexus' element."  *United States v. Gonzalez*, 113 F.4th 140, 148 (1st Cir. 2024).

The magistrate's initial approval of an application for a search warrant receives "significant deference," and should be set aside only where there is "no 'substantial basis' for concluding that probable cause existed."[4] *United States v. Chiu*, 36 F.4th 294, 297 (1st Cir. 2022). This evaluation is normally limited to "the facts and supported opinions set out within the four corners of the affidavit." *Cortez*, 108 F.4th at 8 (cleaned up). That said, if the Defendant shows that the information presented to the magistrate "contains false statements or omissions, made intentionally or with reckless disregard for the truth, and that a finding of probable cause would not have been made without those false statements or omissions," then the search warrant must be set aside. *United States v. Leonard*, 17 F.4th 218, 224 (1st Cir. 2021).

The Defendant argues, first, that the search warrant affidavit was misleading as to probable cause due to fatal omissions (a so-called *Franks* challenge); and second, that several aspects of the warrant are either overbroad or not supported by probable cause. I start with the first.

## A. DEFENDANT'S *FRANKS* CHALLENGE

"There is, of course, a presumption of validity with respect to the affidavit supporting the search warrant." *Franks v. Delaware*, 438 U.S. 154, 171 (1978). To defeat this presumption, the Defendant must show (1) by a preponderance of the evidence, (2) that "the affiant made a false statement or omission 'knowingly and intentionally, or with reckless disregard for the truth,'" and (3) that "with the recklessly omitted information

---

[4] Throughout this Order, I use the term "magistrate" to refer to judges who issue search warrants generally and to the judge who signed the warrant at issue here.

added to the affidavit, the reformed affidavit fails to establish probable cause." *United States v. Gifford*, 727 F.3d 92, 98 (1st Cir. 2013). "Because there is no requirement that every shred of known information be included in a warrant affidavit, the omission of a particular detail, without more, is not enough to satisfy the mens rea element of the *Franks* test." *United States v. Tanguay*, 787 F.3d 44, 49 (1st Cir. 2015). "Rather, an omission triggers the exclusionary rule only if it is 'designed to mislead, or . . . made in reckless disregard of whether [it] would mislead, the magistrate' in his appraisal of the affidavit." *Id*. (citation omitted).

I granted the Defendant's request for a *Franks* hearing because the affidavit's omission of information tending to show that the firearm was outside of the residence at 42 Kellogg Street, combined with the later discovery of the firearm in question outdoors and the convenient timing of that discovery to immediately follow the completion of a thorough search of the residence's interior, generated a concern that the search warrant application had been "designed to mislead." *Id*. Having held an evidentiary hearing to determine just that, I conclude now that the Defendant has not made the required showing of intentional or reckless law enforcement malfeasance.

To argue that the affidavit omitted material information that would have been fatal to the probable cause determination, the Defendant points to statements he made while in custody indicating that the firearm was not in the residence and surveillance footage that shows him taking a white bag outside of the residence. Mot. at 15. The Defendant also points to the omission from the affidavit of certain cell phone location information, specifically, historical location data connecting the Defendant to North Yarmouth and

11

certain details of the real-time location data (in particular, the size of the "ping" radius).[5] Def. Post-Hr'g Br. at 13-16 (ECF No. 93).

As an initial matter, I harbor some doubt that the statements and surveillance footage materially alter the probable cause calculus. Information that increases the likelihood that a particular piece of evidence may be found somewhere else does not necessarily require the conclusion that there is no longer a "fair probability" that evidence will be found in the place the warrant authorizes to be searched. The probable cause standard is something less than "more likely than not," and does not restrict law enforcement to the investigation of one theory of the case at a time. *See United States v. Feliz*, 182 F.3d 82, 87 (1st Cir. 1999) ("The criterion . . . is whether the facts presented in the affidavit would 'warrant a man of reasonable caution' to believe that evidence of crime will be found. . . . There is no requirement that the belief be shown to be necessarily correct or more likely true than false."). The surveillance footage that the Defendant points to shows only that he left a white plastic bag near the garbage cans in front of 42 Kellogg Street. *See* Gov't Ex. 5A. Without the benefit of hindsight, it is far from clear that the bag appearing in the footage contained a firearm. And the Defendant's statements indicating that the gun may have been outside (either because he dropped it or placed it there) are not so clear and certain

---

[5] When this topic arose at the hearing, there was some confusion over whether the cell phone location data had been fully disclosed to the Defense, and if so, whether the Defendant had waived arguments pertaining to the omission of cell phone location information by failing to raise them before the hearing. At the hearing, I permitted examination and argument on the cell phone location information. The parties have since resolved this confusion. In post-hearing briefing, the Defendant confirmed that the Government had in fact produced all cell phone location information to the Defense by December 18, 2024, and that "all relevant materials were in counsel's possession at the time of filing the initial Motion and Reply." *See* Def. Post-Hr'g Br. at 1-2 (ECF No. 93). Because the relevant production from the Government was made only two days before the deadline for pretrial motions in this matter, *see* Speedy Trial Order (ECF No. 39), and because this line of argument was fully explored during the evidentiary hearing, I feel it is appropriate to consider Defendant's arguments on this topic here.

that a reasonable person would have concluded that there was no longer a fair probability that the gun was inside the house.  Even if those statements had been unequivocally clear, the law does not require officers to be blinkered from reason and common sense.  Indeed, the officers would have been entitled to consider the Defendant's responses with a healthy dollop of skepticism under the circumstances; they were not required to noddingly receive all information he volunteered as metaphysical truth and in so doing, abandon all critical thinking.[6]  The fact that law enforcement took steps to search for the weapon outside in response to Mr. Lobor's statements does not undermine that assessment, either—law enforcement can have probable cause to pursue multiple investigative avenues simultaneously.

I have similar concerns with respect to the omitted cell phone location information. While information connecting the Defendant to North Yarmouth could bear upon the probable cause calculus, I am not persuaded that, in light of the other information pointing to 42 Kellogg Street as the Defendant's residence, the inclusion of this information in the warrant application would have altogether "vitiate[d] probable cause."[7]  *Tanguay*, 787 F.3d at 49.  Similarly, while I am modestly troubled by the affidavit's characterization of an area

---

[6] Indeed, the Defendant's purported willingness to volunteer that the firearm was outside could have just as easily been interpreted as an attempt to misdirect the search.  *See* Hr'g Tr. 93:25-94:5 (Det. Googins explaining that she interpreted Mr. Lobor's statements to indicate that "he didn't want us to go inside of the residence," and that this was because "there was probably a weapon inside the residence").

[7] While the information connecting the Defendant to North Yarmouth was significant enough to the investigation to prompt detectives to start driving there on July 8 in the hopes of finding the Defendant or his vehicle, it is also worth noting that law enforcement did not have a specific address in mind—only historic location data indicating that the Defendant had been in that general area before.  *See* Hr'g Tr. 235:3-12.  It appears that investigators planned to drive around that area in the hopes of spotting the Defendant's vehicle—a plan that was quickly abandoned when subsequent "real-time" location data placed the Defendant's device in Portland.  *See* Hr'g Tr. 161:3-162:1; 199:6-15; 200:13-21; 230:19-231:22.

that included the entire city of Portland (as well as parts of South Portland and Falmouth) as "the area of 42 Kellogg St," Aff. ¶ III.19 (Gov't Ex. 7B), I cannot say that the omission of the more detailed description outweighs the other information in the affidavit indicating that the Defendant resided at that address, as further discussed below.[8] *See infra* pp. 18-21.

    Nor did the hearing in this matter adduce any evidence that any of these omissions were "designed to mislead, or . . . made in reckless disregard of [misleading], the magistrate." *Tanguay*, 787 F.3d at 49.  To the contrary, testimony revealed that on the afternoon of July 8, Det. Curlee drafted the search warrant application and affidavit based on the information he had, in the middle of an investigation that was developing rapidly and involved the active participation of a large team of police officers and detectives. Although Det. Curlee did not include as much detail about the cell phone location data as he could have, "there is no requirement that every shred of known information be included in a warrant affidavit." *Id*.  With respect to the location of the firearm, it is not disputed that Det. Curlee was not aware of the statements the Defendant had made to Det. Googins and had not viewed the surveillance footage.[9]  Even if the Defendant is correct that an

---

[8] I am also satisfied that this characterization was not intentionally misleading.  Det. Curlee testified that, on the afternoon of July 8, he and another detective were on their way to North Yarmouth when he received additional location data placing the cellular device near 42 Kellogg Street, which prompted investigators to return to Portland.  *See* Tr. at 161:3-162:1; 199:6-15; 200:13-21; 230:19-231:22.  Because the receipt of information placing the Defendant's cell phone in Portland is what prompted law enforcement to conclude that the Defendant was in or near the residence at 42 Kellogg Street, I cannot conclude that the location data was intentionally or recklessly misrepresented to the magistrate.

[9] While Det. Googins testified that she informed other officers at the scene about her belief that the Defendant may have discarded a firearm outside (and was worried about the potential danger to public safety that this would pose, if true), she did not inform Det. Curlee.  Hr'g Tr. 96:11-97:15, 98:18-24.  It does not appear that anyone reviewed the recorded surveillance footage on July 8.

affiant is responsible for the collective knowledge of the investigation, *see United States v. Roman*, 311 F. Supp. 3d 427, 435 (D. Mass. 2018), the fact that an application omitted information that was known to certain individual officers involved in an investigation strikes me as more akin to negligence than recklessness, without a showing of something more.  And it is well settled that "[a] mere showing of 'negligence or innocent mistake,' . . . is 'insufficient' under *Franks* to obtain suppression," *id.* (quoting *United States v. Tzannos*, 460 F.3d 128, 138 (1st Cir. 2006)), even if the negligently omitted information was "highly probative," *Tanguay*, 787 F.3d at 49.  The First Circuit has described the required showing as a "strict standard," and cautioned that "[r]ecklessness may be inferred directly from the fact of omission only if 'the omitted information was *critical* to the probable cause determination.'"  *Id.* (citation omitted).  None of the information that Det. Curlee omitted was "*critical*," such that the fact of the omission alone would support an inference of recklessness.  *Id.*  Perhaps "a series of negligent mistakes can add up to recklessness," *Roman*, 311 F. Supp. 3d at 438, but I am thoroughly unpersuaded that the mistakes the Defendant has alleged were so grave that their cumulative effect amounts to recklessness under these circumstances.

## B.  DEFENDANT'S CHALLENGE TO THE FACIAL SUFFICIENCY OF THE WARRANT

As discussed above, the Fourth Amendment requires search warrants to be based "upon probable cause" and to "particularly describ[e] . . . the persons or things to be seized."  U.S. Const. Amend. IV.  "An application for a warrant must demonstrate probable cause to believe that (1) a crime has been committed—the 'commission' element, and (2) enumerated evidence of the offense will be found at the place searched—the so-called

'nexus' element." *Gonzalez*, 113 F.4th at 148 (citations omitted). The reviewing court "considers the totality of the circumstances . . . based on the facts and supported opinions set out within the four corners of the affidavit." *Cortez*, 108 F.4th at 8 (internal citations and alterations omitted). The magistrate's initial determination receives "significant deference," and must be upheld unless there is "no 'substantial basis' for concluding that probable cause existed." *Chiu*, 36 F.4th at 297; *see also Cortez*, 108 F.4th at 7 ("We accord considerable deference to reasonable inferences the issuing justice may have drawn from the attested facts, and in a doubtful or marginal case, the court defers to the issuing magistrate's determination of probable cause.") (cleaned up).

To satisfy the particularity requirement, a warrant "must supply enough information to guide and control the executing agent's judgment in selecting where to search and what to seize" and "cannot be too broad in the sense that it includes items that should not be seized." *United States v. Corleto*, 56 F.4th 169, 176 (1st Cir. 2022). This requirement "exists 'to prevent wide-ranging general searches by the police.'" *Id.* (quoting *United States v. Moss*, 936 F.3d 52, 58 (1st Cir. 2019)). That said, a warrant need not "predict with omniscient precision exactly where on the premises evidence to be seized may be located." *Corleto*, 56 F.4th at 176.

The Defendant argues that several aspects of the warrant are either overbroad or not supported by probable cause. Because "[t]he general rule in this circuit requires suppression only of the evidence seized without probable cause," I begin with the justification for searching 42 Kellogg Street, and then take each challenged category of

evidence in turn.[10] *United States v. Giannetta*, 909 F.2d 571, 580 n.7 (1st Cir. 1990); *United States v. Morris*, 977 F.2d 677, 682 (1st Cir. 1992) ("[I]n cases where a search warrant is valid as to some items but not as to others, we have established that a court can admit the former while excluding the latter"); *United States v. Diaz*, 841 F.2d 1, 4 (1st Cir. 1988) ("We need not invalidate the entire warrant simply because a portion of it impermissibly allows seizure of certain items"); *United States v. Riggs*, 690 F.2d 298, 300-01 (1st Cir. 1982) (rejecting "the proposition that blanket suppression is an appropriate remedy for a partially defective warrant").

### 1. Firearms, Ammunition, Parts, Accessories, and Related Documents

The search warrant authorized officers to search 42 Kellogg Street and seize: (1) "Firearms, components of firearms, ammunition, and components thereof"; (2) "Firearm accessories, to include but not limited to, magazines, boxes, scopes, sights, holsters, and/or cleaning equipment"; (3) "Documentation related to firearm possession, to include but not limited to, receipts of purchase or sale of firearms, applications for pistol or other permits or pistol permit identification cards"; (4) "Any and all firearm parts and accessories, to include but not limited to, safes utilized to store firearms, holsters, boxing/packaging

---

[10] In addition to the categories of evidence discussed below, the Defendant also argues that the provision of the warrant authorizing the seizure of evidence "relating to the purchase of financial instruments and or the transfer of funds" was overbroad and not supported by probable cause. Search Warrant ¶ II.B.10 (Gov't Ex. 7A). Because no evidence "relating to the purchase of financial instruments or the transfer of funds" was actually seized, *id.*, I do not address the propriety of this provision of the warrant. I also do not address Defendant's challenge to the authorization to search for and seize persons within the residence, *see id.* ¶ II.B.2, for the same reasons. Finally, I do not address the Defendant's challenge to the provision of the warrant authorizing police to obtain a buccal swab for purposes of DNA analysis, *see id.* ¶ II.B.1, on the understanding that the Government does not intend to introduce at trial evidence related to the buccal swab that was obtained from the Defendant pursuant to this search warrant. *See* Gov't Resp. at 8 n.7 (ECF No. 53). Separately, the Defendant also contends that the warrant's authorization to search two vehicles was not supported by probable cause. Search Warrant ¶¶ I.A.6-7 (Gov't Ex. 7A). Because no evidence was seized from either vehicle, there is no need to evaluate the propriety of those searches here.

materials, and other ammunition loading devices utilized to hold ammunition and storage boxes that can contain ammunition"; and (5) "Any and all ammunition," meaning "cartridge cases, primers, bullets or propellant powder designed for use in any firearm, ammunition storage boxes, [or] pouches to hold."   Search Warrant (Gov't Ex. 7A) ¶¶ II.B.4-8.  Pursuant to this authorization, officers searching 42 Kellogg Street ultimately seized several firearms and related items, including three rifles, four pistols, a 5.7 x 28 mm cartridge, three empty firearms cases, and several magazines.  *See* Gov't Ex. 4A.

The Defendant challenges the sufficiency of the warrant's authorization to search for and seize these items along several different dimensions.  First, the Defendant contends that the warrant application does not contain sufficient information establishing a nexus between the Defendant, the Crown Fried Chicken incident, and the residence at 42 Kellogg Street.  Specifically, the Defendant argues that the affidavit does not support the conclusion that 42 Kellogg Street was his residence or that evidence of the offense under investigation would be found there.  The Defendant further argues that the warrant's authorization to search for and seize multiple firearms and "any" parts, accessories, and ammunition was not supported by probable cause and insufficiently particularized.

In support of the nexus to 42 Kellogg Street, the search warrant affidavit points to (1) a T-Mobile "location ping" "at 1404 hrs." that placed a cellular device associated with the Defendant "in the area of 42 Kellogg St.,"[11] (2) "[l]aw enforcement records indicat[ing] that Anthony Lobor provided 42 Kellogg St. as his address," (3) observation of "a male

---

[11] The affidavit also notes that the phone number associated with this device is listed as Anthony Lobor's in Portland Police Department records, is registered to Lily Lobor, and "was in the area of the address of occurrence at the time of occurrence." Aff. ¶¶ III.13-14, 17-18.

that appears to be Anthony Lobor, outside of 42 Kellogg St., as well as going in and out of the residence" by officers conducting surveillance in that area, and (4) the fact that "Anthony Lobor was apprehended after fleeing the residence by the Portland Police Department." Aff. ¶¶ III.19-21, 25. Defendant contends that because this information is included in the affidavit untethered to any date, it merely establishes that Defendant "may have had past ties to 42 Kellogg Street," but provides "no means . . . to discern whether this information remained up to date." Def. Reply at 3 (ECF No. 58). The Defendant further contends that, even if there was reason to believe he resided at 42 Kellogg Street, the affidavit does not establish probable cause to believe that evidence of the crime under investigation would be found there. *See* Mot. at 11; Def. Post-Hr'g Br. at 4-7.

A warrant to search a residence is not invalid simply because the affidavit does "not specify the precise dates, times of day, or lengths of time" the suspect spent at a residence: "[s]uch a degree of specificity is not required." *Cortez*, 108 F.4th at 10. There is "a temporal component" to the probable cause inquiry, *Gonzalez*, 113 F.4th at 148, but "[s]taleness does not undermine the probable cause determination if the affidavit contains information that updates, substantiates, or corroborates the stale material." *United States v. Bucuvalas*, 970 F.2d 937, 940 (1st Cir. 1992), *abrogated on other grounds by Cleveland v. United States*, 531 U.S. 12 (2000). The probable cause standard "leaves ample room for reasonable inferences based on common experience," and a search warrant application "may rely on the affiant's connecting of a series of dots in a commonsense way." *United States v. Adams*, 971 F.3d 22, 32 (1st Cir. 2020).

In this case, there is no allegation that the information provided in the affidavit connecting the Defendant to 42 Kellogg Street was outdated or factually incorrect—only that Det. Curlee omitted details that would aid in assessing the currentness of that information. A "practical, commonsense" reading of the affidavit, *Feliz*, 182 F.3d at 86, which describes the various steps law enforcement had taken after the Crown Fried Chicken incident to investigate that incident, would allow the reviewing magistrate to infer that the T-Mobile location ping, the surveillance of 42 Kellogg Street, and the apprehension of Mr. Lobor described therein occurred between July 6 and July 8, 2024. *See* Aff. ¶¶ III.19-21, 25. This information, in turn, corroborates the undated law enforcement records indicating that the Defendant had previously reported 42 Kellogg Street as his address. Taken together, this information suffices to establish a fair probability (1) that the Defendant resided at 42 Kellogg Street, and (2) that he had been home following the incident at Crown Fried Chicken.

The question that remains is whether the affidavit establishes a fair probability that evidence of the offense under investigation would be found at 42 Kellogg Street. *See United States v. Roman*, 942 F.3d 43, 51 (1st Cir. 2019) ("The inquiry is not whether 'the owner of the property is suspected of crime' but rather whether 'there is reasonable cause to believe that the specific things to be searched for and seized are located on the property to which entry is sought.'") (citation omitted). Specifically, the Defendant argues that the affidavit does not support the required nexus between 42 Kellogg Street and firearm evidence. *See* Mot. at 11; Def. Post-Hr'g Br. at 4-7. The Defendant points to *United States v. Wilson*, 153 F.4th 478 (5th Cir. 2025), for the proposition that probable cause to believe

20

a particular person has committed a crime involving a firearm does not automatically translate into probable cause to conduct a search of that person's residence for a firearm. But unlike *Wilson*, where two weeks separated the incident under investigation from the search warrant application, the warrant to search 42 Kellogg Street issued only two days after the incident at Crown Fried Chicken.  *See Wilson*, 153 F.4th at 486 (noting that if a suspect "initially stashes [a firearm] in his residence, the likelihood that it remains there 'quickly dwindles' with each passing day").

Given the recency of the incident under investigation, the information in the affidavit pointing to Mr. Lobor's involvement in that incident, and the information set out in the affidavit indicating that Mr. Lobor had been home at some point during the hours that followed, I cannot conclude that the magistrate had "no 'substantial basis' for concluding that probable cause existed" to believe that the firearm brandished at Crown Fried Chicken would be found at 42 Kellogg Street.  *Chiu*, 36 F.4th at 297; *cf. United States v. Beckett*, 321 F.3d 26, 33 (1st Cir. 2003) (search of a residence for a firearm was reasonable, despite a "six-year lag between the 1995 murder and the search" which "somewhat diminishes the likelihood that Beckett would have retained the murder weapon"); *United States v. McNeal*, 818 F.3d 141, 151 (4th Cir. 2016) (probable cause existed to believe evidence of bank robberies would be located in the residence searched, because the defendant was observed coming and going in the days before and after).

The Defendant also contends that the affidavit did not establish probable cause to believe that multiple firearms or ammunition were involved in the offense under investigation, and that as a result, the authorization to search for multiple firearms and

ammunition was unsupported.  The affidavit described an incident involving "a black pistol" or "a semiautomatic handgun," which witnesses speculatively identified as a "P365 Sig Sauer," a "Glock pistol," or "a Ruger or FN handgun."  Aff. ¶¶ III.1-3, 19.  The affidavit also noted that "one FN 5.7 x 28 mm shell casing" had been found in the parking lot.  Aff. ¶ III.2.  This establishes probable cause to believe that the Defendant had committed a crime involving a firearm, and that any firearm in his possession could be evidence of that crime.[12]  As law enforcement witnesses testified, FN 5.7 x 28 mm ammunition is compatible with a wide range of firearms—including handguns, carbines, and rifles.  Hr'g Tr. at 227:18-228:7; 237:18-238:2.

Given the uncertainty about the type of firearm involved in the Crown Fried Chicken incident, combined with the presence at the scene of a shell casing that could be compatible with any of several different types of firearms, I cannot say that the magistrate had "no 'substantial basis'" to authorize a search for any and all firearms that could have been the firearm used in the incident.  *Chiu*, 36 F.4th at 297.  And even though the incident under investigation only involved one firearm, the information in the affidavit established a "fair probability" that any handgun in the Defendant's possession could have been the one that he allegedly brandished at Crown Fried Chicken, and therefore evidence of a crime. *Cortez*, 108 F.4th at 8.  In addition, documents relating to firearms, ammunition, and firearm parts and accessories in the Defendant's possession would also tend to prove that he possessed

---

[12] In addition, the affidavit notes witness accounts of statements the Defendant allegedly made during the Crown Fried Chicken incident that could be interpreted to indicate that he may have had access to multiple firearms and large quantities of ammunition.  *See* Aff. ¶ III.3 ("The suspect . . . said that there was going to be a 'mass shooting in here.'  The suspect further said 'I got a bullet for every one of you.'").

or had access to a firearm and could therefore constitute evidence of the offense under investigation.  To the extent that ammunition in the Defendant's possession could connect him to the incident through the shell casing recovered from the Crown Fried Chicken parking lot, I also cannot say that the magistrate had "no 'substantial basis'" to authorize the search for and seizure of ammunition fitting the caliber found at the scene.[13]  *Chiu*, 36 F.4th at 297.

Finally, the Defendant argues that the warrant's authorization to search for and seize "any" firearms and ammunition was not sufficiently particularized.  Having determined that the affidavit established probable cause to search for and seize any firearms and ammunition that could have been involved in the Crown Fried Chicken incident, suppression of those items—that is, handguns and FN 5.7 x 28 mm ammunition—would not be warranted in any event.  *See Morris*, 977 F.2d at 682.  Although the First Circuit has approved "[g]eneral descriptions in warrants . . . when the surrounding circumstances render it reasonable," it has also set forth a two-part test to evaluate whether that might be the case, considering (1) "the degree to which the evidence presented to the magistrate establishes reason to believe a large collection of similar contraband is present on the premises to be searched" and (2) "the extent to which, in view of the possibilities, the warrant distinguishes or provides the executing agents with criteria for distinguishing the contraband from the rest of the individual's possessions."  *Id*. at 681; *but see United States*

---

[13] The fact that discharge of the firearm was not an element of the offense charged does not somehow void the shell casing's relevance to the investigation, as the Defendant appears to argue.  To the contrary, the shell casing was physical evidence that could connect the firearm to the location of the incident, and a potentially important source of information about the identity of the firearm—and the suspect—involved.

*v. Parker*, 549 F.3d 5, 10 (1st Cir. 2008) ("The warrant [authorizing search for 'weapons' and 'illicit drugs'] was particularized—guns and drugs are certainly a defined class—and far broader classes have been allowed.").  Although the threatening statements that the affidavit attributes to the suspect could perhaps be interpreted to suggest that he may have had more than one firearm or large quantities of ammunition, *see* Aff. ¶¶ III.B.3, 10, witness descriptions of the incident only noted one firearm in the suspect's possession. And there are no additional facts (for example, a prior felony conviction) to suggest that other firearms or ammunition in the Defendant's possession would have been in his possession illegally or evidence of a crime.

Even if the warrant was overbroad, however, the fact that the warrant authorized a search for firearms and ammunition generally, rather than one specific firearm and type of ammunition, "can hardly have enlarged the intrusiveness of the search."[14]  *Parker*, 549 F.3d at 10; *United States v. Ross*, 456 U.S. 789, 820-21 (1982) ("[A] warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found.").  And I am persuaded that, in light of the facts in the affidavit supporting the probable cause determination with respect to *certain* firearms and ammunition, the warrant's authorization to seize *any* firearms and ammunition "was not so facially deficient . . . that executing officers could not reasonably presume it to be valid," or "so lacking in indicia of probable

---

[14] It also seems to me that once officers discovered cocaine and quantities of cash in plain view during their search, as discussed in the next section, those firearms that did not match the description of the handgun brandished at Crown Fried Chicken would have been subject to seizure pursuant to the plain view doctrine. *Cf. Parker*, 549 F.3d at 10 (observing that even if the warrant had "referred only to a gun and marijuana, the officers would have been entitled to seize other guns and illegal drugs as suspected contraband if found in plain view in the course of the narrower search").

cause as to render official belief in its existence entirely unreasonable." *United States v. Jackson*, 118 F.4th 447, 454 (1st Cir. 2024) (cleaned up).

### 2. Illegal Drugs, Drug Paraphernalia, and Sums of Money

The Defendant also contends that the provision of the warrant authorizing the search for and seizure of illegal drugs, drug paraphernalia, and money associated with the trafficking, purchase, or sale of drugs was not supported by probable cause. *See* Search Warrant ¶¶ II.B.16-18. (Gov't Ex. 7A). Even affording "considerable deference" to the magistrate's evaluation, *Cortez*, 108 F.4th at 7, I agree with the Defendant. The search warrant affidavit does not contain any information to suggest that there is probable cause to believe that a crime involving illegal drugs had been committed.[15] *See Gonzalez*, 113 F.4th at 148 (describing the "commission" element of the probable cause requirement). If evidence of illegal drugs, drug paraphernalia, or cash seized from 42 Kellogg Street are to avoid suppression, it must be pursuant to an exception, which the Government bears the burden to prove. *See United States v. Ribeiro*, 397 F.3d 43, 53 (1st Cir. 2005); *United States v. Rutkowski*, 877 F.2d 139, 141 (1st Cir. 1989).

---

[15] The only information in the affidavit offered to substantiate the belief that illegal drugs, drug paraphernalia, or illegally obtained cash would be found at the Defendant's residence is the fact that he "has a prior arrest for Unlawful Possession of Scheduled Drugs." Aff. ¶ III.23. The fact that the Defendant had one prior drug-related arrest at an unspecified earlier date does not, by itself, establish probable cause to search his home for illegal drugs, drug paraphernalia, or money. To conclude otherwise would be to hold that any drug-related arrest effectively strips a person of the Fourth Amendment's protections. Nor am I persuaded that the fact that the offense under investigation involved a firearm tips the scales, despite the Government's urging that "guns and drugs go together like peas and carrots." *United States v. Lopez*, 649 F.3d 1222, 1242 (11th Cir. 2011). While the totality of the circumstances of certain firearms offenses may imply the presence of narcotics (or certain drug offenses, the presence of firearms), I do not see how the circumstances of *this* offense—as described in the affidavit—support such an inference.

"A police officer, even though he does not have a search warrant, may seize an object in plain view as long as he has lawfully reached the vantage point from which he sees the object, has probable cause to support his seizure of that object, and has a right of access to the object itself." *United States v. Paneto*, 661 F.3d 709, 714 (1st Cir. 2011). The cash and narcotics seized in this case were recovered from clothing and a lockbox in the southwest bedroom of 42 Kellogg Street. *See* Gov't Ex. 4A. Additional cash was seized from the closet of the northwest bedroom.[16] *Id.* The officers who recovered these items were lawfully present in the residence "pursuant to a warrant supported by probable cause" to search for and seize firearms and ammunition. *United States v. Crooker*, 688 F.3d 1, 9 (1st Cir. 2012). And with that warrant, they had "a right to access and open" any container within the residence where an item as small as a single round of ammunition could have been found. *Id.* ("[T]he warrant permitted agents to search for items as small as grains of powder. Thus, the agents had a right to access and open the tackle box."). This includes a jacket or sweatshirt pocket, as well as the space inside the bottom hem of the gray sweatshirt, from which small baggies of cocaine base were seized. *See* Gov't Ex. 4A (JAB27). And even if the hem of a sweatshirt is not ordinarily a "container" where it would be "reasonable to believe" one would hide ammunition, *Crooker*, 688 F.3d at 8, finding drugs in the pockets of the sweatshirt would alter that calculus. Law enforcement also found additional firearms concealed in other articles of clothing, *see, e.g.*, Gov't Ex. 2E, and loose bullets in plastic bags, *see, e.g.*, Gov't Exs. 3A, 3F. Under the totality of these

---

[16] Officers also photographed a vacuum sealer, vacuum seal bags, and a box for a kitchen scale, but did not seize these items. Hr'g Tr. 143:8-16.

circumstances, it would have been reasonable to subject the sweatshirt in question to closer inspection. Finally, it is also worth noting that the gray sweatshirt matches the description of the clothing the perpetrator wore during the Crown Fried Chicken incident, *see* Aff. ¶ III.1, and that the warrant authorized the search for and seizure of "[c]lothing associated with the incident on July 6." Search Warrant ¶ II.B.11 (Gov't Ex. 7A). Even if the provision of the warrant authorizing the search for narcotics was not supported by probable cause, the clothing provision certainly was, and independently authorized the seizure of the gray sweatshirt.

The warrantless seizure of an item in plain view is supported by probable cause "if the incriminating character of [the] object is immediately apparent to the police." *United States v. Sanchez*, 612 F.3d 1, 5 (1st Cir. 2010). This standard requires a "'practical, nontechnical probability' that the object is evidence of a crime," *Paneto*, 661 F.3d at 714 (quoting *Giannetta*, 909 F.2d at 579), "taking into account the totality of the circumstances," *Sanchez*, 612 F.3d at 5. Whether the seized item is evidence of the offense officers were already investigating or "some other crime" is of no moment. *Id*. I am satisfied that the incriminating character of the seized narcotics—several small, knotted plastic bags of white powder—would have been immediately apparent to a reasonable police officer. *See Ribeiro*, 397 F.3d at 48, 52-53 (1st Cir. 2005) (upholding the plain view exception as applied to the seizure of a "bag of white powder"). The seized cash, which is not necessarily contraband itself, presents a somewhat closer call. But given the quantities of cash recovered and the circumstances of its storage in proximity to drugs, firearms, or both, I am persuaded that the "practical, nontechnical probability" that the cash was

evidence of a crime would have been immediately apparent to a reasonable law enforcement agent.[17]  *Paneto*, 661 F.3d at 714; *United States v. Hernandez-Mieses*, 931 F.3d 134, 140-41 (1st Cir. 2019) (upholding the application of plain view doctrine to seized "cash, cellphones, and [a] gun," because "the incriminating nature of those items as common tools of the drug trade was apparent"); *United States v. $21,510.00 in U.S. Currency*, 144 Fed. App'x 888, 889 (1st Cir. 2005) (observing that "[a] large amount of hidden currency 'is strong evidence of . . . an illicit connection to drug trafficking'") (citation omitted); *United States v. Levasseur*, 704 F. Supp. 1158, 1167 (D. Mass. 1989) (finding probable cause to believe that "large amounts of cash . . . found in unusual locations such as the nearly $5,400 discovered in a briefcase" was evidence of criminal activity).  This seizure of drugs and cash was therefore consistent with the Fourth Amendment, even though the warrant's authorization to search for and seize drugs and cash was not.

### 3. Electronic Devices

The Defendant also challenges the provision of the warrant authorizing the search for and seizure of "[p]ortable electronic devices capable of communication through cellular and/or Wi-Fi connections attributed to Anthony Lobor" as overbroad and unsupported by probable cause.  Search Warrant ¶ II.B.3 (Gov't Ex. 7A).  The only items taken from 42 Kellogg Street that fall within this description were two flip phones, which were found in

---

[17] In the southwest bedroom, officers found $476 in the pocket of the sweatshirt from which they had also recovered narcotics, and $1,039 from the pocket of a different sweatshirt in the same closet.  Gov't Ex. 4A. From that same closet, officers recovered a rifle, a pistol, and ammunition.  *Id*.  In the northwest bedroom, officers found $7,786 in the closet.  *Id*.  In the same closet, officers found two pistols and more ammunition. *Id*.  They found additional firearms and ammunition elsewhere in the northwest bedroom, as well.  *Id*.

between the mattress and the box spring in the southwest bedroom.[18]  *See* Gov't Ex. 4A (JAB11).

Even if the Defendant is correct about this provision of the search warrant, I am persuaded that the seizure of these flip phones was consistent with the plain view doctrine. As discussed above, police were lawfully present in the bedroom "pursuant to a warrant supported by probable cause" to search for and seize firearms and ammunition. *Crooker*, 688 F.3d at 9.  And because firearms and ammunition could have been found underneath the mattress, officers were entitled to search there. *Id.*; *Ross*, 456 U.S. at 820-21 ("[A] warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found.").  Finally, the "practical, nontechnical probability" that the flip phones could be evidence of criminal activity would have been immediately apparent from the fact that there were two of them, the manner of their concealment, and their storage in proximity to several firearms, drugs, and cash. *Paneto*, 661 F.3d at 714; *see also Hernandez-Mieses*, 931 F.3d at 140-41 (observing that "the incriminating nature" of cellphones, cash, and guns in plain view "as common tools of the drug trade was apparent"); *United States v. Blanchard,* 544 F. Supp. 3d 166, 171 (D. Mass. 2021) (citing *Riley v. California*, 573 U.S. 373, 401 (2014) (observing that "cell phones have become important tools in facilitating coordination and communication among members of criminal enterprises")).  The seizure of the two flip phones was therefore consistent with the Fourth Amendment.

---

[18] The blue iPhone that was found in the white plastic bag behind the garbage cans also falls within this category, but its did not receive the same attention in the parties' filings.  It seems to me, however, that this evidence would also avoid suppression under the plain view doctrine.

### 4.  Proof of Ownership or Occupancy of Premises

Finally, the search warrant authorized the seizure of documents and other items that would "tend to identify the person(s) in residence, occupancy, control or ownership" of the premises to be searched.  *See* Search Warrant ¶¶ II.B.9, 15 (Gov't Ex. 7A).  The Defendant challenges these provisions of the warrant on similar grounds.  As discussed above, the affidavit contains sufficient information to establish probable cause to believe that the Defendant was the perpetrator of the incident at Crown Fried Chicken, that this was a crime under Maine law, and that a firearm and ammunition involved in this offense could be found at 42 Kellogg Street, where law enforcement had probable cause to believe the Defendant lived.  And as the Government points out, documents and other items identifying the inhabitants of 42 Kellogg Street would tend to prove or disprove the Defendant's possession of firearms or ammunition found there, thereby tending to prove or disprove his culpability for the offense under investigation.  Gov't Resp. at 10 (ECF No. 53).  The existence of probable cause to believe that the Defendant resided at 42 Kellogg Street and kept the firearm sought there does not preclude law enforcement from seeking out additional evidence that would strengthen a case against the Defendant—or alternatively, disprove that case.  I therefore cannot conclude that the magistrate had "no substantial basis" for authorizing the search for and seizure of this category of evidence.[19]  *Chiu*, 36 F.4th at 297.

---

[19]  The search warrant also authorized the seizure of "suspected biological materials" and other evidence (specifically, hairs and fibers) "that could later be forensically examined for DNA," *see* Search Warrant ¶¶ II.B.12-14 (Gov't Ex. 7A), which I conclude is justified for the same reasons.

## CONCLUSION

For these reasons, the Defendant's Motion to Suppress (ECF No. 41) is DENIED.

SO ORDERED.

Dated this 11th day of December, 2025.

  /s/ Lance E. Walker
Chief U.S. District Judge